1997-NMCA-070

943 P.2d 579

Joshua ALLRED, a minor, by Larry W. ALLRED and Diana K. Allred, as his parents and next friend, Plaintiffs–Appellants,

v.

BOARD OF REGENTS OF THE UNIVERSITY OF NEW MEXICO, as Trustees for the University of New Mexico Hospital, f/d/a Bernalillo County Medical Center; Kent F. Argubright, M.D.; Elizabeth R. La Roche, M.D.; Jeffrey D. Wicks, M.D.' and Ragon W. Thompson, M.D., Defendants–Appellees.

No. 16812.

Court of Appeals of New Mexico.

May 28, 1997.

Certiorari Denied July 29, 1997.

Charles G. Berry, Stephen P. Eaton, Charles G. Berry & Associates, P.A. Albuquerque, for Appellants.

Robert J. Curtis, Civerolo, Wolf, Gralow & Hill, P.A. Albuquerque, for Appellees Board of Regents of the University of New Mexico, As Trustees for the University of New Mexico Hospital, Kent F. Argubright, M.D.; Elizabeth R. La Roche, M.D.; and Jeffrey D. Wicks, M.D.

Rick Beitler, Marcy Baysinger, Beitler Law Firm, P.A., Albuquerque, for Appellee Ragon W. Thompson, M.D.

## OPINION

WECHSLER, Judge.

1. Plaintiffs appeal two district court orders dismissing their claims against the Board of Regents of the University of New Mexico, Kent Argubright, Elizabeth La Roche, Jeffrey Wicks (the UNM Defendants), and Ragon Thompson. The dismissals resulted from Defendants' motions for dismissal or for summary judgment based on Plaintiffs' violations of the requirements of the rules of discovery. On appeal, Plaintiffs argue that: (1) they did not willfully or in bad faith fail to truthfully answer discovery requests; (2) they did not repeatedly conceal discoverable information; and (3) the real party in interest, Joshua Allred, should not suffer dismissal of the claims since he took no part in any transgressions. Plaintiffs also argue that information relating to a non-witness expert is not discoverable and that the district court did not grant summary judgment, but based its dismissal on Rule 1–037 NMRA 1997. We affirm.

## Factual and Procedural Background

### The First Appeal—the California Locating Service

2. In April 1992, Plaintiffs filed their complaint alleging medical malpractice before and during the birth of their twin sons, resulting in one of their twin sons, Joshua, having cerebral palsy. In June 1992, Plaintiffs' first counsel retained a California expert witness locating service. Two months later, on August 4, 1992, Plaintiffs received an anonymous evaluation letter dated July 14, 1992, from the California locating service. The letter expressed the opinion that Thompson and Argubright were negligent, but did not express an opinion about the other Defendants. On August 24, 1992, Plaintiffs served their answers to Dr. Argubright's interrogatories. They answered, "None." to the question asking:

If any person licensed to practice medicine in any state has ever communicated to you, your attorneys and/or agents, or is prepared to testify in this matter that the treatment allegedly provided to you, or not provided to you, by [Argubright] fell below the applicable standard of care ... please state the name, address and profession of each such person; the date of such communication; and provide a summary of the contents of any such communication....

3. On November 24, 1992, Sweet, Rose, and Talley, who are not parties to this appeal, filed motions for summary judgment based on Plaintiffs' lack of expert testimony. Two weeks later, Plaintiffs requested an extension of time to respond to these motions. At the December 16, 1992 hearing on this motion, Plaintiffs' attorney stated that the file in this case would be sent to a California locating service "this week."

4. On December 18, 1992, the UNM Defendants filed motions for summary judgment based on the lack of expert testimony. Three days later, Plaintiffs filed a motion for an extension of time to respond to these motions and represented that it would take sixty days for the California service to locate an expert and have the expert render an opinion. Thompson filed his motion for sum-

mary judgment based on the lack of expert testimony on February 10, 1993.

5. On January 29, 1993, Plaintiffs' second attorney entered a limited appearance on behalf of Plaintiffs in order to ask for more time to evaluate the case before responding to the pending motions for summary judgment and to discovery requests. On February 9, 1993, the district court held a hearing on Plaintiffs' first attorney's motion to withdraw and, on February 23, 1993, the district court entered an order allowing him to withdraw as counsel and granting Plaintiffs an extension of time until May 10, 1993, to respond to the pending motions for summary judgment, thereby making the second attorney unlimited counsel of record for Plaintiffs.

6. In March 1993, Plaintiffs' second counsel discovered the identity of Dr. Keel, the author of the July 14, 1992 anonymous evaluation letter, and decided to retain Keel as an expert witness. On May 4, 1993, Plaintiffs produced the July 14, 1992 letter from Keel in response to the motions for summary judgment.

7. On May 13, 1993, the UNM Defendants filed a motion to dismiss and for sanctions based on Plaintiffs' misrepresentations regarding discovery of the July 14, 1992 letter. Meanwhile, the district court granted summary judgment in favor of the UNM Defendants and Thompson. It denied the UNM Defendants' motions to dismiss and for sanctions, in which Thompson had joined, stating, however, that it believed Plaintiffs' actions were inappropriate and emphasizing that it did not condone or approve of what occurred. Plaintiffs successfully appealed the orders granting summary judgment in favor of the UNM Defendants and Thompson.

*This Appeal—the CT Scan*

8. On August 6, 1992, Plaintiffs served their response to UNM's request for the production of documents that included a request for any copies of x-ray films in Plaintiffs' possession. Sometime in May 1993, a medical provider in Oklahoma performed a CT scan of Joshua's brain. The record does not indicate that Plaintiffs supplemented their response to UNM's request for production.

9. After the summary judgments in favor of the UNM Defendants and Thompson were reversed, Plaintiffs answered Thompson's interrogatories on June 7, 1995. Interrogatory Number 15 stated:

> Please list the names, medical specialties, addresses and telephone numbers of each and every physician or other health care provider who has *seen, examined or treated* Joshua Allred *since the incident* which gives rise to your Complaint in this case, and with respect to each, please indicate the approximate date or dates when Joshua Allred was *seen, or examined or treated* by each such health care provider and the reason or reasons why Joshua Allred was *seen, examined or treated* by each such other health care provider.

(Emphasis added to "seen, examined or treated.") In response to this interrogatory, Plaintiffs did not list any health care provider in Oklahoma where the CT scan was performed. Nor did Plaintiffs assert any type of objection or privilege with regard to the CT scan in response to this interrogatory.

10. Two weeks later, at Larry Allred's deposition, Plaintiffs disclosed the existence of the CT scan taken in Oklahoma and the radiologist's report finding the results normal. Mr. Allred testified that the film of the scan was at his house. Although the subpoena had directed Larry Allred to bring with him copies of all medical records under his control that related in any way to the claims made concerning Joshua's past medical care, Larry Allred did not bring the film of the CT scan with him to his deposition.

11. The following week, Diana Allred's deposition was taken and Plaintiffs objected to any questions about the CT scan, asserting the work product privilege and also noting that Diana Allred had promised the health care provider that he or she would not be involved in the lawsuit. The district court was called upon to rule on the matter and ordered Plaintiffs to disclose information about the CT scan. We quote at length:

> [DEFENDANTS' ATTORNEY]: It's become known during the course of the deposition that the plaintiffs went to Okla-

homa at some time after the child's birth, which was in 1983, and had a C–T scan performed of the child's brain and the results of that scan were that the child had a normal brain. In the deposition now I have started a line of questioning with the mother regarding the C–T scan, and what I want to explore with her is when she went to have the C–T scan, who did it, where it was done, what the results were, where the films are and things of that nature.

[Plaintiff] has objected to my line of questioning as being within the work product doctrine and privileged from discovery because the C–T scan was obtained upon the instruction of their attorneys, and he's instructed her not to answer any questions regarding the C–T scans.

[During Plaintiffs' response, Plaintiffs' co-counsel represented to the district court that the CT scan was performed at the behest of Plaintiffs' former counsel.]

. . . .

THE COURT: All right. The plaintiff, she cannot, by promising somebody that she won't use them, limit my ability to order—or the Court's ability to have discovery in lawsuits. So her commitment to whoever took the C–T scan is immaterial in my ruling.

If the plaintiff refuses to disclose that information, I will not allow any issue of damages to go to the jury that could be proved, disproved, affected or in any way—and in which this C–T scan would be in any way relevant to establishing the validity or the severity or anything of that nature.

*So what I'm saying is if she doesn't talk about it, you don't go to the jury, aren't I?*

*[PLAINTIFFS' COUNSEL]: I believe that's what you're saying, Judge.*

THE COURT: And that is an election that the plaintiffs' lawyers can make. But those are the kinds of things that are discoverable if you want to go to the jury alleging that this condition exists and it's a result of fault on the behalf of the defendants.

[DEFENDANTS' COUNSEL]: And I would say, Your Honor, that it goes with-out saying that your ruling also extends to production of those scans, as well.

THE COURT: Yes, sir. I mean, you know, you can't hide them. That's a risk you run when you get examinations made.

(Emphasis added.) After this ruling, Plaintiffs continued to refuse to answer any questions regarding the CT scan, asserting that they would file a motion to reconsider the district court's ruling. Defendants warned Plaintiffs that they would file a motion to dismiss if answers about the CT scan were not forthcoming, and Plaintiffs still refused to answer any questions.

12. On July 5, 1995, the UNM Defendants filed a motion for sanctions and to dismiss or for summary judgment based on Plaintiffs' violations of the discovery process. On July 14, 1995, Thompson filed a motion to dismiss and joined in the UNM Defendants' July 5, 1995 motion. On July 20, 1995, Plaintiffs filed a motion to reconsider the district court's ruling regarding the CT scan, along with a response to the UNM Defendants' motion to dismiss or for summary judgment.

13. On July 25, the district court held a hearing on the motions. At the hearing, counsel for Plaintiffs stated that the CT scan was:

done after the Court had entered the order granting summary judgment while the case was on appeal. So this is not something that was available at the time the motion was argued many, many moons ago. This is something that was done recently under my direction and is not something that was done back when [Plaintiffs' first attorney] was handling the case or anything like that.

The next day the district court entered a letter opinion granting both motions to dismiss or for summary judgment and denied Plaintiffs' motion to reconsider its ruling regarding discovery of information about the CT scan.

14. The same day Plaintiffs filed a response to Thompson's July 14, 1995 motion to dismiss, which had joined in the UNM Defendants' motion. On August 7, 1995, Plaintiffs filed a motion to reconsider the dismissal of the claims. On August 15, 1995,

the district court entered an order dismissing the claims against the UNM Defendants and denying Plaintiffs' motion to reconsider the ruling on discovery of information regarding the CT scan. No findings of fact or conclusions of law were made with this order. On August 22, 1995, the district court held another hearing on Plaintiffs' motion to reconsider the dismissal of the claims against the UNM Defendants and on Thompson's motion to dismiss.

15. In September and October 1995, Plaintiffs appealed the order dismissing the claims against the UNM Defendants and the denial of their motion to reconsider the ruling regarding discovery of information relating to the CT scan. In December 1995, the district court entered a three-page letter opinion granting Thompson's motion to dismiss. The district court recited the entire disturbing history of the case and concluded with the following observations:

It appears in this case that a pattern is developing of securing a ruling[, and i]f they don't like the ruling, asking to reconsider and present[ing] additional evidence and additional argument which was available at the time of the original ruling. [At e]ach new hearing held[,] additional information comes out which often contradicts prior evidence.

Plaintiffs consistently failed to timely comply with the requirement to supplement interrogatories.

Based upon all the foregoing, this court has no comfort that there has been complete discovery made. I have no confidence that defendants can comfortably, adequately and fairly prepare for trial. I have no confidence that I appreciate the true facts in this case.

16. The district court's order dismissing Plaintiffs' claims against Thompson made the following findings and conclusions:

1).... The assertion of the attorney work-product privilege at the deposition of Diana Allred was untimely.

2) The Oklahoma City imaging study should have been disclosed promptly were [sic] performed in response to prior discovery requiring disclosure, and the attorney work-product privilege should have been

claimed at that time as to the content & findings.

3) During the hearing held telephonically during the deposition of plaintiff, Diana Allred, concerning the assertion of the attorney work-product privilege with regard to the Oklahoma City imaging study, the Court ruled that if information requested about the imaging study was not disclosed, no issue of damages would go to the jury which could be proved, disproved or affected by this evidence. In making this ruling, the Court indicated that non-compliance with the ruling would effectively [preclude] plaintiff from recovering.

4) The physical evidence resulting from the imaging study (the CT scan) was discoverable and should have been produced.

5) [Recounts failure to disclose information relating to Dr. Keel's July 14, 1992, evaluation letter or to object to its discovery and Plaintiffs' representations to the district court.] [Plaintiffs] should have disclosed this information in response to discovery or, in the alternative, should have sought an appropriate and timely ruling from this Court, but plaintiffs did neither.

6) Plaintiffs have consistently failed to timely comply with the requirement to supplement interrogatories.

7) Plaintiffs have failed to comply with Defendants' reasonable discovery requests and, as a result, defendants have been deprived of the opportunity to adequately and fairly prepare for trial.

8) Plaintiffs' conduct in failing to comply with reasonable discovery requests and plaintiffs' misrepresentations to this Court constitute a pattern of [willful] disregard for the discovery rules and the rulings of this Court.

9) Good cause exists for granting Dr. Thompson's Motion.

During the January 9, 1996 presentment hearing on this order the district court stated that it was going to take out the word "willful" in paragraph eight of the requested findings of fact, explaining:

I'm never sure when somebody has what I think is a strained construction of rules or

obligations that their actions are willful, because most of the time when I think somebody has a strained construction of something, they are looking right back at me and thinking I have a strained construction of the same thing.

On January 16, 1996, Plaintiffs filed an appeal from this order. The appeals were consolidated by order of this Court.

*Rule 1–037 NMRA 1997*

17. Rule 1–037(B)(2) identifies sanctions based on a party's failure to obey an order to permit or provide discovery and permits the district court to enter orders including, but not limited to:

(b) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(c) an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

We review a district court's grant of Rule 1–037 sanctions for abuse of discretion. *See Marchman v. NCNB Texas Nat'l Bank,* 120 N.M. 74, 90, 898 P.2d 709, 725 (1995); *see also Sandoval v. Martinez,* 109 N.M. 5, 12, 780 P.2d 1152, 1159 (Ct.App.1989) ("We will not reverse a dismissal under Rule 1–037 unless, after reviewing the full record and the reasons the district court gave for its order, we are left with a ' "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." ' " (citations omitted)).

18. Rule 1–037(D) provides that the actions authorized under Rule 1–037(B)(2)(b) and (c) are also available when a party fails to appear for a deposition or to answer interrogatories. It states in part: "The failure to act described in this paragraph may not be excused on the grounds that the discovery sought is objectionable unless the party failing to act has applied for a protective order as provided by Rule 1–026."

19. The Supreme Court has held that a district court's oral ruling may justify sanctions under Rule 1–037. *See Marchman,* 120 N.M. at 90, 898 P.2d at 725. In *Sandoval,* 109 N.M. at 8–9, 780 P.2d at 1155–56, this Court determined that Rule 1–037 applies to false answers to interrogatories as well as to the failure to answer interrogatories. The same logic leads us to conclude that the failure to properly supplement answers to interrogatories, or the refusal to answer questions on matters ruled discoverable during a deposition, also falls within the ambit of Rule 1–037.

20. In *United Nuclear Corp. v. General Atomic Co.,* 96 N.M. 155, 202, 629 P.2d 231, 278 (1980) [*UNC v. GAC*], the Supreme Court stated that Rule 1–037(B)(2) applies to any failure to comply with discovery orders, but that sanctions under Rule 1–037(b)(2)(iii) (now Rule 1–037(B)(2)(c)) which entail "the denial of an opportunity for a hearing on the merits, may only be imposed when the failure to comply is due to the willfulness, bad faith or fault of the disobedient party." The opinion reaffirmed the Court's previous adoption of the test for willfulness as " 'any conscious or intentional failure to comply ... as distinguished from accidental or involuntary noncompliance, and ... no wrongful intent need be shown to make such a failure willful.' " *Id.* (citations omitted).

21. Subsequent cases have variously applied the requirement of willfulness, bad faith, or fault depending on the particular circumstances of the case. In *UNC v. GAC,* the district court had made explicit, extensive findings regarding the disobedient party's willfulness and bad faith. *Id.* at 203, 629 P.2d at 279. In *Thornfield v. First State Bank,* 103 N.M. 229, 231–32, 704 P.2d 1105, 1107–08 (Ct.App.1983), this Court upheld the entry of a default judgment entered sua sponte by the district court as a result of the plaintiff's failure to obey its order to respond to discovery requests. The district court had not made a specific finding of willfulness on the part of the plaintiff, but had entered findings that: the plaintiffs were aware of the request for production and had not responded to it; plaintiffs acknowledged that they failed to completely answer interrogato-

ries and that the interrogatories should have been supplemented; and plaintiffs acknowledged that no attempt was made. to obtain additional time to respond to the request for production despite the defendant having filed a motion to compel four months earlier. *Id.* at 231, 704 P.2d at 1107. This Court stated that the facts supported a determination of willfulness even though the plaintiffs apparently did not act in bad faith. *Id.* at 232, 704 P.2d at 1108.

22. In *Sandoval v. United Nuclear Corp.*, 105 N.M. 105, 729 P.2d 503 (Ct.App.1986) [*Sandoval v. UNC* ], this Court reversed the termination of workers' compensation benefits to the plaintiff, imposed as a sanction under Rule 1–037(D) based on the plaintiff's failure to appear for his deposition. Plaintiff, a citizen of Mexico, had argued that it was impossible for him to comply with the discovery order since he was an excludable alien and could not lawfully enter the United States. *Id.* at 107, 729 P.2d at 505. He made an offer of proof that he was physically unable to make the journey to comply with the discovery order and offered to have his deposition taken in Mexico or to answer written interrogatories and to submit to any physical examination in Mexico. *Id.* The case had been previously appealed and, in the prior memorandum opinion remanding for further proceedings, this Court had stated that specific findings regarding willfulness were a prerequisite for the imposition of sanctions under Rule 1–037(D). *Id.* at 106–07, 729 P.2d at 504–05. On remand, the trial court entered findings that plaintiff knew of the deposition and failed to attend, but did not make a specific finding that plaintiff's action was willful, in bad faith, or plaintiff's fault. *Id.* at 107, 729 P.2d at 505. This Court noted that its prior opinion was the law of the case and determined that, under the facts of the case, it could not be said that the plaintiff's failure to appear was willful. *Id.* at 108, 729 P.2d at 506.

23. The opinion in *Bishop v. Lloyd McKee Motors, Inc.*, 105 N.M. 399, 733 P.2d 368 (Ct.App.1987) [*Bishop*], relied on *Sandoval v. UNC* and *UNC v. GAC* for the proposition that extreme discovery sanctions such as default or dismissal without a hearing on the

merits required a finding that the plaintiff's failure to comply with discovery was conscious or intentional. *Bishop*, 105 N.M. at 400, 733 P.2d at 369. The district court had dismissed the plaintiff's complaint for failure to comply with its discovery order to be available for depositions within a specific time. *Id.* Plaintiff had sought a protective order prior to the first scheduled deposition and later filed a motion to stay proceedings under the Soldiers' and Sailors' Civil Relief Act. *Id.* Plaintiff's motion to reconsider the dismissal attached his affidavit stating that he was in the Navy and his training and orders did not permit him to leave the Naval post in Florida until after the deadline set by the district court had passed. *Id.* This Court reversed the dismissal of the complaint based on the lack of a finding of willful noncompliance. *Id.* at 401, 733 P.2d at 370.

24. In *Lopez v. Wal–Mart Stores, Inc.*, 108 N.M. 259, 771 P.2d 192 (Ct.App.1989), this Court determined that the facts did not support the trial court's finding that plaintiff willfully failed to comply with a discovery order to produce certain records. *Id.* at 261, 771 P.2d at 194. In that case, plaintiff had produced all the requested records prior to the entry of the order of dismissal, but the district court had not been notified of plaintiff's compliance with the court's order. *Id.* This Court reversed the dismissal that had been based on the district court's erroneous belief that the plaintiff had failed to comply with its discovery order. *Id.* at 261–62, 771 P.2d at 194–95.

25. In the case on appeal, we treat the district court's orders as a dismissal under Rule 1–037(D) for various violations of the requirements of the rules of discovery. Since the district court's conditional order stating that Plaintiffs must disclose information about the CT scan or be precluded from submitting the issue of damages to the jury was tantamount to a conditional order of dismissal, we do not consider whether the district court technically granted summary judgment in favor of the UNM Defendants and Thompson. *See generally United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir.1980) ("Thus, neither dismissal nor preclusion of evidence that is tantamount to dismissal may be imposed

when the failure to comply with discovery orders is due to circumstances beyond the disobedient party's control.")

26. The district court, in finding that Plaintiffs' conduct in failing to comply with reasonable discovery requests and Plaintiffs' misrepresentations to the court constituted a pattern of disregard for the discovery rules and the rulings of the court, refused to find that this disregard was willful. Although this finding was specifically made only in the order dismissing Plaintiffs' claims against Thompson, the finding necessarily applies to the dismissal of Plaintiffs' claims against the UNM Defendants as well, since Thompson had joined the UNM Defendants' motion to dismiss and the dismissals were based on exactly the same course of conduct.

27. We recognize that the opinions in *Sandoval v. UNC* and *Bishop* state that a specific finding of willfulness is required before default or dismissal should be entered without a hearing on the merits. *Marchman,* too, states that the court must find willfulness or bad faith before entering the severe sanction of dismissal. 120 N.M. at 91, 898 P.2d at 726. Nevertheless, we read these requirements in the context of those cases and in the context of other cases, such as *UNC v. GAC.* So read, it is clear that "willfulness," used alone, is shorthand for willfulness, bad faith, or other fault. *See UNC v. GAC,* 96 N.M. at 202, 629 P.2d at 278. For similar reasons, "willfulness or bad faith" likewise includes other fault, and the nature of the fault is a conscious or intentional failure to comply, as opposed to involuntary or accidental non-compliance. *Id.* We do not believe that limiting the language in the cases to "willfulness" or "willfulness and bad faith" was intended to exclude other fault of the type expressly recognized in *UNC v. GAC.*

■ 28. Moreover, *Sandoval v. UNC* did not purport to be authoritative on the point; it merely followed a prior unpublished opinion in the case (which is not established precedent, Rule 12–405(C) NMRA 1997) as law of the case. Also, in both *Sandoval v. UNC* and *Bishop,* the record indicated the failure to comply with discovery orders was involuntary and beyond the control of the disobedient party. Therefore, we understand this line of cases, beginning with *UNC v. GAC,* to require (1) a clear showing of willfulness, bad faith, or other fault in the record; or (2) when the record is unclear, more explicit findings by the trial court (indicating that that court indeed found willfulness, bad faith, or other fault) that are then supported by substantial evidence in the record. *See Bowles v. Los Lunas Schs.,* 109 N.M. 100, 105, 781 P.2d 1178, 1183 (Ct.App. 1989) (on appeal, this Court will liberally construe a district court's findings in a manner that will uphold the decision of the district court).

■ 29. The district court in this case refused to use the word "willful" in finding that Plaintiffs' pattern of conduct was in disregard of the discovery rules and the court's rulings. We do not read this refusal, however, as a factual determination that Plaintiffs' refusal to comply with discovery orders or their failure to properly answer interrogatories or their misrepresentations to the district court were not conscious or intentional. The court's reluctance apparently related only to whether Plaintiffs' counsel disagreed with the court regarding the applicable law.

30. The district court did enter findings that Plaintiffs consistently failed to timely comply with the requirement to supplement answers to interrogatories and failed to comply with Defendants' reasonable discovery requests. The district court's findings also recount its order to disclose information regarding the CT scan and the warning that failure to comply with this order would effectively preclude Plaintiffs from recovering. Moreover, the record provides a clear showing that Plaintiffs' actions constituted conscious, intentional failures to comply with discovery requests and with the order of the district court and were not accidental or involuntary actions on Plaintiffs' part. *See UNC v. GAC,* 96 N.M. at 202, 629 P.2d at 278. In particular, the sanction of dismissal in this case is supported by: Plaintiffs' misrepresentations to the district court regarding the status of their attempts to locate an expert; their failures to seek protective orders regarding discovery to which they ob-

jected; and, perhaps most egregiously, their failure to comply with the district court's order to disclose information regarding the CT scan after the district court denied Plaintiffs' motions to reconsider, after having been warned of the consequences of their failure to comply.

**31.** To the extent Plaintiffs claim that any alleged discovery violation was based on their good faith belief that the information sought was not subject to discovery, we note that a failure to act may not be excused on the grounds that the discovery sought is objectionable. Rule 1–037(D). We are also not persuaded by Plaintiffs' argument that Thompson's Interrogatory Number 15 was a request for information regarding only treating physicians, since the interrogatory stated repeatedly that it sought information regarding health care providers who had seen, examined, *or* treated Joshua. *See generally Regional Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 156 (6th Cir.1988) ("[M]isconduct is not any less misconduct because it is executed with a veneer of good intentions.")

32. Unlike the situation in *Sandoval v. UNC* and *Bishop*, in this case the evidence does not indicate Plaintiffs were unable to comply with the district court's order. Nor is this case like *Lopez*, where the trial court dismissed without holding a hearing under circumstances in which the trial court could have learned relevant information at the hearing that may well have altered its ruling on dismissal. While the record may or may not indicate bad faith on the part of Plaintiffs, it clearly demonstrates that their actions in refusing to comply with the district court's order regarding discovery of information about the CT scan were intentional. The record also demonstrates that Plaintiffs were warned of and understood the sanction the district court would impose if they re-

fused to comply with its order regarding the CT scan.

33. Plaintiffs argue that the sanction of dismissal against Joshua Allred, as the real party in interest who was not directly involved in the actions of Plaintiffs described above, would be unjust. They cite no authority for this proposition, however, which would require this Court to determine that a client is not bound by the actions of his or her attorney. We need not consider this argument further. *See In re Adoption of Doe,* 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (issues unsupported by cited authority will not be reviewed on appeal).

*Conclusion*

**34.** Although dismissal under Rule 1–037 is an extreme sanction, "[d]istrict courts have a *duty* to enforce compliance with rules of discovery, and they should not shirk from imposition of the sanction of dismissal." *Sandoval,* 109 N.M. at 9, 780 P.2d at 1156. Under the circumstances of this case, and in particular because of Plaintiffs' recalcitrance in obeying the district court's discovery order, the dismissal of Plaintiffs' claims against the UNM Defendants and Thompson was a proper exercise of the district court's discretion.

35. The orders of the district court dismissing Plaintiffs' claims are affirmed.

36. **IT IS SO ORDERED.**

HARTZ, C.J., and PICKARD, J., concur.