2001–NMSC–035

35 P.3d 972

**Marta LEWIS, as personal representative of the Estate of Martin C. LEWIS, deceased, Plaintiff–Respondent,**

v.

**Norberto R. SAMSON, Jr., M.D., and Raymond F. Ortiz, M.D., Defendants–Petitioners.**

No. 25,990.

Supreme Court of New Mexico.

Nov. 9, 2001.

Hinkle, Hensley, Shanor & Martin, L.L.P., William P. Slattery, David B. Lawrenz, Santa Fe, NM, Madison, Harbour, Mroz & Brennan, P.A., Lorri Krehbiel, Albuquerque, NM, for Petitioners.

The Holland Law Office, Jo Anne Shanks, Santa Fe, NM, for Respondent.

## *OPINION*

SERNA, Chief Justice.

{1} Plaintiff Marta Lewis, acting as personal representative for decedent Martin C. Lewis, filed an action for wrongful death arising out of medical malpractice against Defendants Norberto R. Samson, Jr., M.D., and Raymond F. Ortiz, M.D. Following a jury verdict and judgment in favor of Defendants, Plaintiff appealed to the Court of Appeals. The Court of Appeals reversed the judgment and remanded for a new trial based on the conclusion that the district court abused its discretion in relation to a discovery ruling. *Lewis v. Samson*, 1999–NMCA–145, ¶ 2, 128 N.M. 269, 992 P.2d 282, *cert. granted*, No. 25,990, 128 N.M. 150, 990 P.2d 824 (1999). The Court of Appeals also ruled that the district court erred in denying Plaintiff's pretrial motion to exclude evidence concerning comparative fault. *Id.* ¶ 3. We granted Defendants' petition for writ of certiorari to the Court of Appeals in order to review both rulings made by the Court of Appeals. We now reverse.

## I.  Facts and Proceedings

{2} In February 1994, Moses Griego stabbed Martin Lewis in the back eight times during a fight in Tucumcari, New Mexico. Seven of the eight stab wounds penetrated Lewis's lungs. Following the stabbing, Lewis was treated by Defendants at the emergency room of Dan C. Trigg Memorial Hospital (Trigg Hospital) in Tucumcari. At some point during the treatment, Defendants telephoned the University of New Mexico Hospital (University Hospital) to request an emergency transfer of Lewis for a thoracotomy. University Hospital informed Defendants that Lewis would not survive a ground transfer and sent a specialist to Trigg Hospital by plane. Defendants attempted to stabilize Lewis but did not perform a thoracotomy; instead, they awaited the arrival of the specialist. Approximately two hours later, the specialist arrived and immediately performed a thoracotomy, but Lewis did not survive. Griego was later convicted of second degree murder for the stabbing.

{3} Plaintiff brought suit against Defendants, alleging medical negligence in their treatment of Lewis. Plaintiff also originally named University Hospital as a defendant and initially filed her complaint in October 1995 in the Second Judicial District. Following an amicable resolution of the claim against University Hospital, Plaintiff dismissed University Hospital as a defendant. Plaintiff then re-filed in the Tenth Judicial District in January 1997. The district court, in February 1997, set the trial date for July 14, 1997; however, the court rescheduled the trial for January 1998 due to an inability to seat an impartial jury.

{4} At trial, Plaintiff attempted to establish Defendants' negligence by introducing expert testimony that Defendants performed below the standard of care for a reasonable physician. Specifically, Plaintiff's expert testified that Defendants should have inserted chest tubes earlier, should have attempted to transfer Lewis more quickly, and should have attempted to perform a thoracotomy as a last resort. Plaintiff's expert testified that Lewis had a ninety percent chance of survival if he had received appropriate care. In response, Defendants testified that they were not properly trained to perform a thoracotomy, that they sought to transfer Lewis in a timely manner, and that they did not unduly delay the insertion of chest tubes. Defendant Samson, a general surgeon, testified that he had not performed a thoracotomy in sixteen years, that no physician had privileges to perform an open thoracotomy at Trigg Hospital at the time of the incident, and that the emergency room was not properly equipped and the staff not properly trained to perform an open thoracotomy. In addition, Defendants introduced expert testimony to support their contention that they performed within an acceptable range of medical care. Defendants' expert testified that the timing of the insertion of chest tubes made no difference in the outcome of Lewis's treatment. Defendants' expert testified that nothing could have been done to save Lewis's life given the number and severity of the stab wounds, the occurrence of the stabbing in the rural area of Tucumcari, and the unavailability of an experienced chest surgeon. With regard to the timeliness of seeking to trans-

fer Lewis, the parties disputed whether Defendant Ortiz first called University Hospital about transferring Lewis at 3:06 a.m., as claimed by Defendants, or at 3:57 a.m., as claimed by Plaintiff. Although telephone records indicated a call from Trigg Hospital to University Hospital at both 3:06 a.m. and 3:57 a.m., the parties disputed whether Lewis was the subject of the first call. Defendants also argued that Griego's tortious and criminal act of repeatedly stabbing Lewis constituted the sole proximate cause of Lewis's death. By special verdict, the jury found that Defendants were not negligent in their treatment of Lewis and returned a verdict in favor of Defendants.

## II. Discovery Rulings

{5} This appeal implicates two separate discovery rulings made by the district court: (1) the partial granting of a defense motion to exclude witnesses due to a lack of timely disclosure; and (2) the denial of Plaintiff's motion to reopen discovery and to modify the discovery deadlines in a pretrial order. The Court of Appeals concluded that the district court abused its discretion in denying Plaintiff's motion to reopen discovery. *Lewis,* 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶ 34. As a result, the Court determined that it was unnecessary to address the district court's earlier decision to exclude witnesses. *Id.* ¶ 24. As explained below, we believe that both of the district court's discovery rulings are interconnected, and we thus disagree with the Court of Appeals' review of the motion to reopen discovery in isolation. We believe it is necessary to review each ruling in order to assess the propriety of the district court's actions in this case.

### A. Late Disclosure of Witnesses

{6} On February 12, 1996, Plaintiff responded to a list of interrogatories submitted by Defendant Samson which included a request to identify each witness whom Plaintiff intended to call at trial and a brief synopsis of their testimony. Plaintiff stated that she intended to call "any and all personnel from Dan Trigg Hospital. No other witnesses have been developed." Plaintiff did not supplement her answer to this interrogatory during the course of litigation.

{7} Over one year later, on March 14, 1997, Defendant Ortiz requested that Plaintiff supplement her responses to interrogatories. Defendant Ortiz expressly identified in this letter that he was "primarily interested in [Plaintiff's] trial witnesses and exhibits." Plaintiff failed to respond to this request. On May 30, 1997, approximately six weeks before the original trial date of July 14, 1997, Plaintiff served Defendants a document entitled "Plaintiff's Witness List for Trial." This list included fifteen witnesses that had not been previously disclosed by Plaintiff and were not personnel of Trigg Hospital. Even though the original trial date was imminent, Plaintiff failed to disclose the substance of these witnesses' testimony but stated in a cover letter that "[t]hese are friends and colleagues only and will testify about Martin's life." Plaintiff further indicated that she would, "of course, not call all of them and [would] provide a final list, when determined, by the last part of June," approximately two weeks before trial. Finally, Plaintiff informed Defendants that she would also be calling her expert witnesses. She attached a report from an economist, Dr. Brian McDonald, outlining his opinions concerning economic damages. Plaintiff had not previously disclosed this witness to Defendants, even though Dr. McDonald's report was dated February 26, 1997.

{8} On June 9, 1997, Defendant Ortiz filed a motion to exclude the fifteen fact witnesses disclosed by Plaintiff on May 30, 1997. Defendant Ortiz argued that Plaintiff's late disclosure of witnesses violated the rules of discovery and, due to the lack of specificity with respect to which of the witnesses would testify and the subject matter of the testimony, prejudiced Defendants' ability to depose Plaintiff's witnesses and to prepare rebuttal. In response to this motion, on June 11, 1997, Plaintiff agreed not to call the fifteen fact witnesses identified on May 30, 1997, but still intended to call the late-identified expert, Dr. McDonald, as well as Penny Griner, an employee of University Hospital, and Sharon Faison, an employee of Trigg Hospital. Defendant Samson then filed a motion to ex-

clude these three witnesses on the basis of late disclosure.

{9} The district court held a hearing on the motion to exclude the witnesses on June 30, 1997. At the hearing, Defendant Samson argued that Plaintiff ignored the rules of discovery by disclosing her witnesses at such a late date. Plaintiff did not provide an explanation for the late disclosure. Instead, Plaintiff merely characterized the late disclosure of Dr. McDonald and Griner as her "oversight[s]." She informed the court that Dr. McDonald was a necessary witness for her case and requested a continuance of the case in lieu of excluding Dr. McDonald's testimony. Plaintiff intended to call Griner to testify concerning the transfer telephone calls made by Defendants and, in particular, Defendant Ortiz's assertion that he first called University Hospital to request a transfer for Lewis at 3:06 a.m. instead of 3:57 a.m. Griner was not on duty on the night of the call and had no personal knowledge about the calls received by University Hospital on that night, but according to Plaintiff, Griner was familiar with the hospital's routine procedures for taking in-coming calls. Plaintiff indicated that she had not yet spoken with Griner and that she was not certain which party would benefit from Griner's testimony about hospital procedure. Plaintiff intended to introduce Faison's testimony to establish that rib spreaders were available at Trigg Hospital on the night of Lewis's stabbing. Plaintiff argued to the court that Defendants had access to Faison as an employee of Trigg Hospital and that Defendants were aware of her anticipated testimony because Faison completed an affidavit earlier in the case.

{10} In response to Plaintiff's arguments, Defendant Samson contended that an oversight did not excuse Plaintiff's failure to disclose Dr. McDonald and Griner. Additionally, Defendants argued that Plaintiff was previously aware of the disputed issue of Defendant Ortiz's telephone call to University Hospital and that Plaintiff's failure to identify Griner at an earlier date caused them to believe that all issues involving personnel from University Hospital had been resolved by Plaintiff's settlement of her claim against the hospital. Defendants also stated that Griner's availability prior to the original trial date appeared questionable. Defendants thus contended that they would be prejudiced by Plaintiff's late disclosure of Griner. Defendants finally contended that Faison's testimony would be cumulative of an admission made by Defendant Samson that rib spreaders were available at Trigg Hospital at the time of treatment.

{11} The district court ruled that, to the extent that Faison's testimony would be cumulative of Defendant Samson's admission, it would be excluded. The court also found that Plaintiff was aware of the issue of the telephone conversations with University Hospital from the very beginning of the case and that, as a result, Griner would be excluded due to Plaintiff's untimely disclosure. With respect to Dr. McDonald, the court indicated that Defendants had a right to view his report and that it was improper for Plaintiff to withhold the information. However, the court recognized that Dr. McDonald's testimony would be important to Plaintiff's case and denied Defendants' request to exclude Dr. McDonald's testimony in the interest of fairness.

{12} Typically, under our Rules of Civil Procedure, "[a] party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the party's response to include information thereafter acquired." Rule 1–026(E) NMRA 2001. However, an exception to this general rule applies in this case.

A party is under a duty seasonably to supplement the party's response with respect to any question directly addressed to the identity of each person expected to be called as a witness at trial, the subject matter on which the party is expected to testify and the substance of the party's testimony.

Rule 1–026(E)(1). This exception applies to both fact witnesses and expert witnesses, the latter of which are subject to discovery as specifically provided in Rule 1–026(B)(5)(a) (requiring that a party "identify each person whom the ... party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts

and opinions to which the expert is expected to testify and a summary of the grounds for each opinion"). Furthermore, the failure to comply with the duty seasonably to supplement the disclosure of witnesses subjects a party to the discovery sanctions provided in Rule 1–037(B)(2) NMRA 2001. *See Allred ex rel. Allred v. Bd. of Regents of Univ. of N.M.*, 1997–NMCA–070, ¶ 19, 123 N.M. 545, 943 P.2d 579 (applying Rule 1–037(B)(2) to the failure to supplement answers to interrogatories in a proper manner); *see also* Rule 1–037(D) (providing that, in response to a failure to serve answers or objection to interrogatories, the trial court "may make such orders in regard to the failure as are just, and among others it may take any action authorized under Subparagraphs (a), (b) and (c) of Subparagraph (2) of Paragraph B of this rule").

{13} We review a trial court's decision to impose discovery sanctions under Rule 1–037(B)(2) for an abuse of discretion. *United Nuclear Corp. v. Gen. Atomic Co.*, 96 N.M. 155, 239, 629 P.2d 231, 315 (1980) ("It is well-settled that the choice of sanctions under Rule [1–037] lies within the sound discretion of the trial court. Only an abuse of that discretion will warrant reversal." (footnote omitted)). Applying this standard of review, we will disturb the trial court's ruling only "when the trial court's decision is clearly untenable or contrary to logic and reason." *Newsome v. Farer*, 103 N.M. 415, 420, 708 P.2d 327, 332 (1985). Moreover, whereas we more closely scrutinize, albeit still under an abuse of discretion standard, the severe sanction of dismissal, we entrust sanctions short of dismissal to the sound discretion of the trial court. *Gonzales v. Surgidev Corp.*, 120 N.M. 151, 158, 899 P.2d 594, 601 (1995); *accord Marchman v. NCNB Tex. Nat'l Bank*, 120 N.M. 74, 91, 898 P.2d 709, 726 (1995) ("Lesser sanctions ... may be applied 'to *any* failure to comply with discovery orders.'" (quoting *United Nuclear*, 96 N.M. at 202, 629 P.2d at 278)). "Excluding a witness,

while still a drastic remedy, is 'one of the lesser sanctions' available to the court." *Shamalon Bird Farm, Ltd. v. United States Fid. & Guar. Co.*, 111 N.M. 713, 716, 809 P.2d 627, 630 (1991) (quoting *Jenzake v. City of Brookfield*, 108 Wis.2d 537, 322 N.W.2d 516, 519 (App.1982)). Finally, we note that the trial court is not required to exhaust less severe sanctions in imposing a just remedy for a violation of discovery rules. *See Gonzales*, 120 N.M. at 158, 899 P.2d at 601.

{14} The record indicates that Plaintiff failed to supplement her answers to interrogatories concerning the identity of her witnesses at trial and therefore violated her duty under Rule 1–026(E)(1). Additionally, Plaintiff failed to respond to a specific request by Defendants to supplement her answers to interrogatories. With only approximately six weeks remaining before the original trial date, Plaintiff identified numerous previously undisclosed fact witnesses. At that same time, Plaintiff also offered a previously undisclosed expert witness, even though the date of the expert's report clearly indicated Plaintiff's prior awareness of this witness. Despite having the expert's report, Plaintiff did not include this witness in her answers to interrogatories, did not supplement her answers to interrogatories to disclose this witness, and did not disclose the witness's report, in violation of her duties under Rule 1–026(B)(5)(a).

{15} Rule 1–037(B)(2)(b) provides that a trial court may respond to an abuse of discovery by "refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence." Additionally, we have said that, "[i]n any just search for truth, a trial court must have broad discretion to admit or refuse testimony of witnesses whose identity was not revealed in answers to pretrial interrogatories." *Montoya v. Super Save Warehouse Foods*, 111 N.M. 212, 215, 804 P.2d 403, 406 (1991).[1]

---

1. In contrast to our deference to trial courts, the Federal Rules of Civil Procedure provide for mandatory exclusion of undisclosed witnesses. *See* Fed.R.Civ.P. 37(c)(1) ("A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."); *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir.1998) ("[T]he new rule clearly contemplates stricter adherence to discovery require-

In this case, there were numerous violations of the rules of discovery with respect to the requirement of timely witness disclosure. This type of conduct, if tolerated, would frustrate the general purposes of discovery and the specific purpose of witness disclosure. *See, e.g., State v. Ruiz,* 119 N.M. 515, 521, 892 P.2d 962, 968 (Ct.App.1995) ("The purpose of witness disclosure rules is to give parties a fair opportunity to test the credibility of the witnesses and to eliminate surprise and gamesmanship."); *Redman v. Bd. of Regents,* 102 N.M. 234, 238, 693 P.2d 1266, 1270 (Ct.App.1984) ("The discovery rules were adopted in the first place to eliminate surprise and allow for full preparation of a case.").

{16} The record indicates that the district court took into account the potential prejudice to Defendants from the discovery violations and the importance of the evidence to Plaintiff's case. The court also considered whether Plaintiff's conduct was excusable by ascertaining Plaintiff's prior awareness of the need for the late-disclosed witnesses. The court indicated an intention to ensure fairness to both parties. Based on these considerations, the district court entered the lesser sanction of excluding two of Plaintiff's witnesses, Griner and Faison, while allowing Plaintiff to call her third undisclosed witness, Dr. McDonald.

{17} In this case, Plaintiff demonstrated a repeated disregard for the rules of discovery. *Cf. Allred,* 123 N.M. 545, 943 P.2d 579, 1997–NMCA–070, ¶ 15 ("Plaintiffs consistently failed to timely comply with the requirements to supplement interrogatories."). The district court, after balancing the interests of both parties, imposed the lesser sanction of excluding Plaintiff's witnesses under Rule 1–037(B)(2)(b) and limited its ruling to witnesses that were, based on Plaintiff's proffer, relatively unimportant to Plaintiff's case. Reviewing the full record in this case, we believe there is substantial evidence in the record to support the district court's decision. Thus, we conclude that the district court acted well within its discretion in its

imposition of sanctions for Plaintiff's violation of the rules of discovery.

### B. Pretrial Order and Reopening Discovery

{18} On June 18, 1997, the district court entered a pretrial order, which included the parties' witness lists, and set a discovery deadline of June 27, 1997. Following the inability to seat a jury on the original trial date of July 14, 1997, and the postponement of trial until the following January, Plaintiff filed a motion to amend the pretrial order to allow additional discovery and the inclusion of more witnesses. In a brief in support of the motion, Plaintiff stated, "This court denied Plaintiff two witnesses because the witnesses were not named until six weeks prior to the scheduled beginning of the trial. Moreover, Plaintiff now wishes to add another witness from Amarillo to prove that Amarillo accepts patients from New Mexico...." Plaintiff contended "that counsel is oftentimes faced with the difficulty of addressing and dealing with supplemental information that comes to light after the deadline for discovery passes." At a hearing on Plaintiff's motion, Plaintiff emphasized her request to call the witness from Amarillo but also indicated to the district court that she would like to call the specialist from University Hospital who flew to Tucumcari to treat Lewis, Dr. James Hanosh, apparently to testify about Defendant Ortiz's telephone calls to University Hospital. Plaintiff had not spoken with Dr. Hanosh but apparently believed that he would provide information regarding University Hospital's in-coming call procedure. Dr. Hanosh did not actually speak to Defendants on the telephone until 4:20 a.m. and had no personal knowledge about the subject of the 3:06 a.m. call. In addition to these witnesses, Plaintiff further hoped to reopen all of discovery through the day of trial. Plaintiff indicated that she was unaware of Defendant Ortiz's claim that he called University Hospital at an earlier time and that she needed additional witnesses to respond to that claim. Plaintiff further contended that the district court's earlier exclusion of Faison was based on the false premise

ments, and harsher sanctions for breaches of this rule, and *the required sanction in the ordinary*

*case is mandatory preclusion."* (emphasis added)).

that her testimony would be cumulative of an admission by Defendant Samson. According to Plaintiff, Defendant Samson's admission left some ambiguity about the availability of functional rib spreaders at Trigg Hospital at the time of treatment.

{19} The district court informed Plaintiff that "there's a reason for the pretrial order ... [and] a reason for the time limits." The court found that Plaintiff was previously aware of the information she sought to discover and that the pretrial order did not prevent Plaintiff from ascertaining the information prior to the entry of the pretrial order. However, the court afforded some relief to Plaintiff by ensuring that Plaintiff's existing witnesses would be able to testify about the possibility of a transfer to Amarillo, by instructing Defendant Samson to clarify his admission, and by informing Plaintiff that the court would give her some latitude in her impeachment of witnesses.

{20} The Court of Appeals determined that the district court did not abuse its discretion in relation to Faison and the witness from Amarillo because these witnesses would have provided cumulative testimony. *Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶ 30. However, the Court of Appeals concluded that the court abused its discretion in declining Plaintiff's request to add Griner to her witness list. *Id.* ¶ 31. The Court of Appeals did not address Plaintiff's broad request to reopen discovery until the date of trial or her request to add Dr. Hanosh as a witness. *Id.* ¶ 34.

{21} In reviewing the district court's ruling, we believe it is useful to separate Plaintiff's requests into two categories: (1) her request to add Griner and Faison as witnesses; and (2) her request to add the witness from Amarillo, to reopen discovery in general, and to add Dr. Hanosh as a witness. Addressing Plaintiff's first request, we note initially that Plaintiff's conduct in failing seasonably to disclose Griner and Faison as her witnesses, as well as Defendants' motion to exclude these witnesses for abuse of discovery, occurred prior to the district court's entry of the pretrial order. At the time of drafting the pretrial order, however, Defendants' motion to exclude Griner and Faison

was still pending before the district court. As a result, the pretrial order listed Griner and Faison as two of Plaintiff's witnesses. Subsequently, the district court ruled on Defendants' motion and excluded Griner and Faison based on Plaintiff's abuse of discovery. Thus, the court's original exclusion of Griner and Faison had no relationship to the pretrial order or the discovery deadline imposed pursuant to Rule 1–016 NMRA 2001. It was not the discovery deadline in the pretrial order that prevented Plaintiff from calling Griner and Faison as witnesses for the original trial date. Instead, Plaintiff's inability to call these witnesses stemmed from the district court's decision to grant Defendants' motion to exclude them as witnesses based on Plaintiff's abuse of discovery. As a result, we will review the motion to reopen discovery, as it relates to Griner and Faison, as a motion to reconsider the district court's earlier decision to exclude these two witnesses due to Plaintiff's abuse of discovery.

{22} We do not believe the district court abused its discretion in denying the motion to reconsider. In ruling on the motion to reconsider, the court had before it the same issues presented at the hearing in June in relation to Plaintiff's multiple violations of the rules of discovery. With respect to Faison, the district court ascertained Defendant Samson's intended meaning with respect to his admission about the rib spreaders. The court instructed Defendant Samson to clarify his admission to reflect his intended meaning and determined that the clarification would obviate the need for Faison's testimony. We therefore agree with the Court of Appeals that the district court reasonably determined that Faison's testimony would have been cumulative.

{23} With respect to Griner, Plaintiff provided no additional information about the substance of Griner's testimony. Thus, from the district court's perspective, based on Plaintiff's initial proffer at the hearing on the motion to exclude late-disclosed witnesses, it was unclear whether Griner's testimony would have been favorable to Defendants or to Plaintiff. While it is certainly true that the degree of prejudice that would

have been experienced by Defendants if Griner was allowed to testify diminished significantly after the delay in the trial date, we reiterate that the decision to impose a lesser sanction for an abuse of discovery is a discretionary ruling. Potential prejudice is only one factor in the balancing of interests under Rule 1–037(B). *Enriquez v. Cochran,* 1998–NMCA–157, ¶ 48, 126 N.M. 196, 967 P.2d 1136 ("In determining the nature of the sanctions to be imposed, the trial court must balance the nature of the offense, the potential prejudice to the parties, the effectiveness of the sanction, and the imperative that the integrity of the court's orders and the judicial process must be protected."). "It is not our responsibility as a reviewing court to say whether we would have chosen a more moderate sanction." *United Nuclear,* 96 N.M. at 239, 629 P.2d at 315 (quoted authority omitted). Instead, we merely address whether we are convinced that the trial court's decision is irrational or clearly against logic. We have repeatedly deferred to lower courts' decisions to impose discovery sanctions, especially in the context of sanctions less severe than dismissal. *See, e.g., Gonzales v. N.M. Dep't of Health,* 2000–NMSC–029, ¶¶ 15–16, 129 N.M. 586, 11 P.3d 550 (stating that "[t]he choice of sanctions for abuse of the discovery process falls within the sound discretion of the trial court" and concluding that "[t]he sanctions imposed were proportional to the offenses"); *Medina v. Found. Reserve Ins. Co.,* 117 N.M. 163, 166–67, 870 P.2d 125, 128–29 (1994). We believe that it is appropriate to do so again in this case because we do not believe that the district court's sanction was unreasonably harsh. The district court allowed Plaintiff to utilize Dr. McDonald as an expert witness despite her failure to disclose this witness in a timely manner. It appears that the court selected a lighter sanction, the exclusion of a relatively unimportant witness as determined by Plaintiff's proffer, that was designed as a proportionate response to the precise abuse of discovery committed by Plaintiff. The unrelated delay in the trial date did not serve to absolve Plaintiff of her misconduct.

{24} We highlight the fact that Plaintiff repeatedly breached her duties under the rules of discovery. *See generally Allred,* 123 N.M. 545, 943 P.2d 579, 1997–NMCA–070, ¶¶ 29–30 (determining from a pattern of conduct that a litigant's abuse of discovery was conscious and intentional and thus supported the severe sanction of dismissal). Although a finding of willfulness is not required for the imposition of a lesser sanction, such as the exclusion of witnesses, we believe that the circumstances of this case indicate that the district court's exclusion of Griner may have been necessary in order to deter future misconduct and to protect the integrity of the court. *See Gonzales,* 120 N.M. at 157, 899 P.2d at 600 ("We note that an abuse of the discovery process affects more than private litigants. It also affects the integrity of the court and, when left unchecked, would encourage future abuses."). The district court did not abuse its discretion in denying Plaintiff's motion to reconsider.

■ {25} We now address the district court's denial of Plaintiff's motion to reopen discovery regarding the other witnesses identified in Plaintiff's motion. Under Rule 1–016(E), a pretrial "order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice." "[B]y the time of entry of the pretrial order, our rules contemplate that the issues to be tried will have been identified." *Fahrbach v. Diamond Shamrock, Inc.,* 1996–NMSC–063, 122 N.M. 543, 550, 928 P.2d 269, 276. Accordingly, the movant bears the burden of demonstrating a manifest injustice sufficient to warrant modification of a pretrial order. We review a trial court's decision with respect to a motion to modify a pretrial order for an abuse of discretion. *State ex rel. State Highway Dep't v. Branchau,* 90 N.M. 496, 497, 565 P.2d 1013, 1014 (1977). Courts have applied a number of factors in evaluating a trial court's ruling with respect to a motion to modify a pretrial order due to manifest injustice:

1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeabil-

ity of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

*Sil–Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1514 (10th Cir.1990) (quoted authority omitted). We believe these factors are useful in evaluating a trial court's decision under Rule 1–016(E), but we emphasize that, under the ultimate standard of an abuse of discretion, we will not reverse unless we have "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United Nuclear*, 96 N.M. at 203, 629 P.2d at 279 (quotation marks and quoted authority omitted); *accord Sil–Flo*, 917 F.2d at 1514.

■■■ {26} With respect to reopening discovery generally until the day of trial, the district court clearly did not abuse its discretion in refusing Plaintiff's request. To have granted this request, the district court would have had to ignore the very purpose of entering a pretrial order. *See Fahrbach*, 122 N.M. at 550, 928 P.2d at 276 ("A pretrial order narrows the issues for trial, reveals the parties' real contentions, and eliminates unfair surprise."); *Branchau*, 90 N.M. at 497, 565 P.2d at 1014 (similar). Moreover, following the inability to seat a jury in July of 1997, the district court was forced to reschedule the trial for January 1998 because that was the first available date for a trial given the court's full docket. As a result, the court had a legitimate concern that the complete reopening of discovery would produce undue delay and interfere with the court's ability to control its docket. *See, e.g., Pizza Hut, Inc. v. Branch*, 89 N.M. 325, 327–28, 552 P.2d 227, 229–30 (Ct.App.1976) (upholding the dismissal of an action for the failure to comply with a court order to answer interrogatories fully and completely and stating "that trial courts have supervisory control over their dockets and inherent power to manage their own affairs so as to achieve the orderly and expeditious disposition of cases"). We also believe that the district court did not abuse its discretion in denying Plaintiff's request to add the witness from Amarillo. Plaintiff was afforded the alternative relief of having one of her existing witnesses testify at trial concerning the feasibility of transferring a patient from Tucumcari to Amarillo. *See Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶ 30.

■■■ {27} Turning to Plaintiff's request to add Dr. Hanosh to her list of witnesses, we review this issue in light of the six factors articulated above. While it is true, as the Court of Appeals observed, that trial was not imminent and there was not a great deal of potential prejudice to Defendants, *see id.* ¶ 29, Plaintiff admitted she was not diligent in obtaining discovery. *Cf. Sil–Flo*, 917 F.2d at 1514 (upholding a lower court's denial of a motion to reopen discovery based in part on the fact that "the plaintiffs did not make diligent use of the long period the court originally provided for discovery"); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992) ("If [a] party was not diligent, the inquiry should end."). As we have already discussed, Plaintiff was aware of the dispute concerning Defendant Ortiz's telephone calls to University Hospital from the beginning of the case and was also aware of Dr. Hanosh's role in relation to the telephone calls. Therefore, Plaintiff's need for this evidence was foreseeable at the time that the district court established the discovery deadline. *Cf. Reaves v. Bergsrud*, 1999–NMCA–075, ¶ 27, 127 N.M. 446, 982 P.2d 497 ("From the beginning of this case, however, Plaintiff should have known that an expert to testify regarding causation would be necessary.... Therefore, the need for such an expert was of no surprise to Plaintiff and there was no resulting unfairness to her."). Additionally, Plaintiff had over eighteen months of discovery, informed the court in February of 1997 that the only remaining discovery in the case was the deposition of Defendants' experts, and indicated to the court that she was fully prepared for trial. Finally, although Dr. Hanosh may have been able to provide some relevant testimony about University Hospital's in-coming call procedures, he did not have any personal knowledge about Defendant Ortiz's actions. Plaintiff indicated to the district court at the hearing on the motion to reopen discovery that she believed she had sufficient evidence

to support a claim for negligence without the additional witnesses and admitted that she had not yet spoken with Dr. Hanosh about his potential testimony. Under these circumstances, we believe that the district court was entitled to view Dr. Hanosh's testimony as only marginally relevant to Plaintiff's claim. It would appear then that the six factors listed in *Sil-Flo* weigh against Plaintiff and in favor of the denial of the motion to reopen discovery.

{28} However, the question we face is not whether we believe that a balancing of the relevant factors weighs in favor of one party or another. Our review is limited to deciding whether we are convinced that the trial court committed a clear error in judgment in *its* balancing of these factors. *See Reaves*, 127 N.M. 446, 982 P.2d 497, 1999–NMCA–075, ¶ 26 ("Emphasis, however, must be placed on the premise that amendment or modification is discretionary."). In reviewing the Court of Appeals' discussion of this issue, it appears that the Court of Appeals weighed the *Sil-Flo* factors and reached its own balance in favor of Plaintiff. *See Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶ 29 ("Our review of the record *indicates to us* the significant presence of several of the six factors noted in *Sil-Flo* that would have warranted the amendment of the pretrial order in this appeal." (emphasis added)); *id.* ¶ 32 ("In summary, we conclude that the six factors balance in Plaintiff's favor."). In doing so, the Court of Appeals overlooked the proper standard of review; the six factors listed in *Sil-Flo* are intended to inform, not replace, the abuse of discretion standard that applies to trial court decisions under Rule 1–016(E). While the Court of Appeals' determination that the factors weighed in Plaintiff's favor in this case might be a reasonable view of the evidence, that is not the appropriate inquiry on appellate review.

{29} Under the applicable standard of review, we conclude that the district court reasonably determined that the factors weighed against Plaintiff and that Plaintiff failed to demonstrate a manifest injustice. *Cf. Reaves*, 127 N.M. 446, 982 P.2d 497, 1999–NMCA–075, ¶¶ 27–28 (upholding the denial of a motion for leave to name an unidentified

expert because the district court did not abuse its discretion in determining that the movant failed to demonstrate a manifest injustice). In short, the district court believed that "[t]here was no showing that this was newly discovered or critically important evidence." *Branchau*, 90 N.M. at 497, 565 P.2d at 1014. The lack of adequate trial preparation due to dilatory conduct simply does not constitute a manifest injustice for purposes of relieving a party of the deadlines imposed in a pretrial order. *Cf. Johnson*, 975 F.2d at 609 ("[C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief."). Under these circumstances, "[w]e will not interfere with the trial court's enforcement of pretrial deadlines." *Reaves*, 127 N.M. 446, 982 P.2d 497, 1999–NMCA–075, ¶ 28. Thus, we conclude that the district court did not abuse its discretion in denying Plaintiff's motion.

### III. Concurrent and Successive Tortfeasors

{30} Prior to trial, Plaintiff requested that the district court restrict Defendants from arguing that the tortious actions of Lewis's assailant, Griego, caused Lewis's injuries. Plaintiff agreed to stipulate that Lewis arrived at the hospital with stab wounds, but she objected to any evidence or argument concerning the source of the wounds. The court denied Plaintiff's motion. At the conclusion of the trial, the district court instructed the jury on the topic of comparative negligence in accordance with UJI 13–302D NMRA 2001. The Court of Appeals made two separate rulings on this issue. First, the Court concluded that the district court's denial of Plaintiff's pretrial request was erroneous. *Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶¶ 50–51. The Court determined that the "irrelevant evidence of the assailant's fault erroneously distracted the jury from properly examining Defendant's causation." *Id.* ¶ 52. As explained further below, we believe that the evidence of Griego's fault was of critical importance to the issue of proximate causation, and we therefore disagree with this ruling by the Court of Appeals. Second, the Court of Appeals determined that the district court erred in in-

structing the jury on comparative fault because the facts in the present case do not support a theory of concurrent tortfeasor liability. We agree with the Court of Appeals that the district court erred in giving a comparative fault instruction, but we do not believe that this instruction caused any prejudice to Plaintiff; on the contrary, the instruction relieved Plaintiff of the burden of proving an element of her claim.

{31} The Court of Appeals concluded that both of its rulings on this issue were compelled by our opinion in *Lujan v. Healthsouth Rehabilitation Corp.*, 120 N.M. 422, 902 P.2d 1025 (1995). The Court interpreted *Lujan* as standing for the proposition that medical malpractice committed while treating an injury caused by an initial tortfeasor and resulting in an enhanced injury constitutes a successive tort for which principles of comparative fault do not apply. *Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶ 43. According to the Court of Appeals, "[w]hether a tort committed by a tortfeasor is concurrent or successive can be determined as a question of law." *Id.* ¶ 44. Because principles of comparative fault do not apply in a successive tortfeasor context, the Court determined that evidence of the original tortfeasor's negligence injects a false issue into a trial in an action against a successive tortfeasor. *Id.* ¶¶ 49–56. Additionally, the Court held that,

> if the facts of a particular case warrant the argument by either a plaintiff or a defendant that the theory of liability is one of successive and not concurrent tortfeasor liability, or vice versa, then the party arguing such liability has the burden of adducing evidence not only of the negligence of

the tortfeasor but of the divisibility or indivisibility of the injury.

*Id.* ¶ 56. Based on this construction of *Lujan*, the Court of Appeals determined with respect to the present case that the district court should have ruled as a matter of law that Defendants were successive tortfeasors based on Plaintiff's mere allegation of an enhanced injury. *Id.* ¶¶ 41, 54, 902 P.2d 1025. The Court then held that "evidence of the assailant's fault, that is, his criminal liability or his negligence, was irrelevant and improper to a determination of Defendant[s'] liability by the jury." *Id.* ¶ 50, 902 P.2d 1025. Defendants contend that the Court of Appeals misconstrued our opinion in *Lujan*. We agree.[2]

{32} In New Mexico, the common law doctrines of contributory negligence and joint and several liability have been replaced with a system of pure comparative negligence and, with respect to concurrent tortfeasors, several liability. *See* NMSA 1978, § 41–3A–1(A) (1987); *see also Scott v. Rizzo*, 96 N.M. 682, 687–89, 634 P.2d 1234, 1239–41 (1981); *Bartlett v. N.M. Welding Supply, Inc.*, 98 N.M. 152, 158, 646 P.2d 579, 585 (Ct.App.1982). In *Lujan*, this Court explored the applicability of these principles to cases involving successive tortfeasors. 120 N.M. at 425–27, 902 P.2d at 1028–30. More specifically, *Lujan* addressed cases involving an initial injury caused by tortious conduct and a subsequent enhancement of the initial injury caused by foreseeable medical negligence occurring during the course of medical treatment for the initial injury. *Id.* at 426, 902 P.2d at 1029. We limit our discussion to this narrow class of cases.[3]

---

**2.** In this case, the jury found by special verdict that Defendants were not negligent. Because the jury first considered whether Defendants were negligent and thus did not reach the separate question of whether Defendants' negligence proximately caused Lewis's death or the question of the relative percentage of fault attributable to Defendants as compared to Griego, the district court's rulings regarding the admissibility of evidence of Griego's fault and regarding the jury instructions on comparative fault, even if erroneous, would constitute harmless error. *See Fahrbach*, 122 N.M. at 552–53, 928 P.2d at 278–79; *cf. Norwest Bank N.M., N.A. v. Chrysler Corp.*, 1999–NMCA–070, ¶ 15, 127 N.M. 397, 981 P.2d 1215 (concluding that a jury finding of no proxi-

mate causation rendered harmless a jury instruction concerning the allocation of fault). As a result, it is not necessary for us to conduct an exhaustive analysis of the law in New Mexico relating to successive tortfeasors. Nevertheless, given the existence of the Court of Appeals' opinion on this issue, we would be remiss if we did not take this opportunity to prevent any further misapprehension of our opinion in *Lujan*. We therefore address this more limited matter.

**3.** In particular, we need not examine in detail the distinction between concurrent and successive tortfeasors. *Compare Lujan*, 120 N.M. at 426, 902 P.2d at 1029 (listing factors that might

{33} In *Lujan*, we explained that, with respect to an action by the injured party against the original tortfeasor, the original tortfeasor is jointly and severally liable for the entire harm to the plaintiff, including the original injury and any foreseeable enhancement of the injury by medical negligence.[4] *Id.* at 426–27, 902 P.2d at 1029–30. "When a person causes an injury to another which requires medical treatment, it is foreseeable that the treatment, whether provided properly or negligently, will cause additional harm." *Id.* at 426, 902 P.2d at 1029; *accord* Restatement (Second) of Torts § 457 (1965). In other words, the original tortfeasor will not be heard to complain of foreseeable medical negligence precipitated by the initial tortious injury in defense of his or her own liability to the injured party. Accordingly, instead of treating the issue as a question of fact for the jury, as is typical of questions of proximate causation, *Calkins v. Cox Estates*, 110 N.M. 59, 61, 792 P.2d 36, 38 (1990), we impose as "a positive rule of decisional law" the requirement of joint and several liability upon the original tortfeasor for the original and enhanced injuries. *Herrero v. Atkinson*, 227 Cal.App.2d 69, 38 Cal.Rptr. 490, 493 (1964).[5] Thus, an original tortfeasor's liability in the context of subsequent medical negligence operates as an exception to the general rule of several liability. *See* § 41–3A–1(C)(4) (providing that joint and several liability applies "to situations ... having a sound basis in public policy").

{34} With respect to claims against the subsequent tortfeasor, we adopted in *Lujan* the standard for enhanced injuries that the Court of Appeals had previously applied in *Duran v. General Motors Corp.*, 101 N.M. 742, 749–50, 688 P.2d 779, 786–87 (Ct.App. 1983), *overruled on other grounds by Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 902 P.2d 54 (1995). *Lujan*, 120 N.M. at 426, 902 P.2d at 1029. The Court of Appeals in *Duran* derived this standard from *Huddell v. Levin*, 537 F.2d 726, 737 (3d Cir.1976), in which the Third Circuit discussed the proof requirements for claims against a car manufacturer for design defects resulting in an enhancement of injuries that were caused by an initial car accident, referred to as crashworthiness or second collision claims. Under our application of the standard to medical malpractice cases in *Lujan*, a plaintiff, whether the initial tortfeasor seeking indemnity or the injured party seeking damages, who pursues an action against a physician and who alleges an enhanced injury caused by tortious medical treatment arising out of an original tort must prove (1) that the successive tortfeasor's negligence resulted in injuries separate from and in addition to the injuries which otherwise would have been caused by the initial tort, and (2) the degree of enhancement caused by the medical treatment by introducing evidence of the injuries that would have occurred absent the physician's negligence. *Lujan*, 120 N.M. at 426, 902 P.2d at 1029. Under the first element from *Lujan*, unless the plaintiff establishes an enhancement of the initial injury, then the physician's negligence cannot be said to be a cause in fact of the plaintiff's harm; the plaintiff would have suffered the same harm regardless of the physician's negligence. Under the second element from *Lujan*, if the initial tortfeasor, or the injured party, as the

---

be relevant to such an inquiry), *with Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶ 75 (Hartz, J., concurring in part, dissenting in part) (suggesting that the factors listed in *Lujan* do not provide a useful framework for distinguishing concurrent and successive tortfeasors).

4. The original tortfeasor is not liable for injuries caused by medical negligence that are so remote from the original injury as to be unforeseeable.

5. There has been some disagreement as to whether this principle operates as a positive rule of law, and some courts have held that the principle is instead merely a product of the general rules of proximate causation. *See Kemper Nat'l P & C Cos. v. Smith*, 419 Pa.Super. 295, 615 A.2d 372, 375–76 (1992). However, we rejected this position in *Lujan* by determining that the original tortfeasor may seek indemnity from the negligent physician for the entirety of the enhanced injury, a determination for which we relied in part on *Herrero*. *See Lujan*, 120 N.M. at 427, 902 P.2d at 1030. If, as the court held in *Smith*, the original tortfeasor's liability arose from his or her "own negligent conduct and not from a positive rule of law," *id.* at 376, then the original tortfeasor would be liable for a portion of the enhanced injury to the extent that the enhancement was proximately caused by the original tortfeasor, and the original tortfeasor could not seek indemnity for this liability.

case may be, is unable to establish the degree of enhancement, then the initial tortfeasor remains responsible for the entire harm. This two-part proof requirement from *Lujan* effectuates the Legislature's intent that, "[w]here a plaintiff sustains damage as the result of fault of more than one person which can be causally apportioned on the basis that distinct harms were caused to the plaintiff, ... [e]ach person is severally liable only for the distinct harm which that person proximately caused." Section 41–3A–1(D).

{35} Based on the principles articulated above, we conclude that the Court of Appeals erroneously concluded that Defendants could not introduce evidence of Griego's fault. Defendants argued that Griego was wholly responsible for Lewis's death. It is the plaintiff's burden in a negligence case to prove the element of proximate causation. *See* UJI 13–302B NMRA 2001. Thus, Defendants' argument concerning Griego represents a basic proximate cause defense; if Griego was the sole cause of Lewis's death, as Defendants argued, then Plaintiff would fail to establish that Defendants' negligence proximately caused Lewis's harm. In a typical negligence case involving concurrent tortfeasors, the jury assesses whether each defendant's negligence is a cause of the plaintiff's harm and, if so, then the jury compares the negligence of each tortfeasor in order to assign a percentage of fault. *See* UJI 13–2219 NMRA 2001. In an enhanced injury case, a jury does not compare the negligence of the tortfeasors for the enhanced injury, but the plaintiff must still prove that the physician's negligence proximately caused an enhancement of the initial harm suffered at the hands of the original tortfeasor. *Lujan*, 120 N.M. at 426, 902 P.2d at 1029. The physician is only responsible for the enhanced injury if the plaintiff satisfies his or her burden under *Lujan* of proving both an enhancement and the degree of enhancement.

{36} Plaintiff introduced evidence in this case, in the form of expert testimony, that Lewis would have survived but for Defendants' negligent treatment. Defendants countered this theory through contrary expert testimony and by arguing to the jury that Griego alone was responsible for Lewis's death. This is an issue of proximate cause, which is an issue on which Plaintiff bore the burden of proof and an issue that must be resolved by the jury. The Court of Appeals, although recognizing that Defendants' argument related to proximate causation, *Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶ 51 ("The court thus essentially allowed Defendants ... to successfully argue ... that the assailant, not Defendants, proximately caused the patient's death."), mistakenly extended our remarks in *Lujan* concerning comparative fault to the issue of proximate causation. "A *Bartlett*-style apportionment of fault is inapplicable to a successive and distinct enhancement," *Lujan*, 120 N.M. at 426, 902 P.2d at 1029, because "the doctrine of joint and several liability applies ... to the enhanced portion of the injury," *id.* at 427, 902 P.2d at 1030. However, the application of joint and several liability to the enhanced injury requires that the plaintiff first carry the burden of proving proximate causation by establishing an enhanced injury and the degree of enhancement. *See id.* at 427, 902 P.2d at 1030 (stating that joint and several liability applies to an enhanced injury "[i]n cases involving successive tortfeasors whose separate causal contributions to the plaintiff's harm can be measured").

{37} The Court of Appeals' holding that any evidence of the initial tort must be excluded creates an impracticable, artificial inquiry which removes any context from the jury's determination of causation. If, based on the two-part *Lujan* test, a plaintiff fails to prove that a physician's negligence enhanced the original injury, then the original tortfeasor's negligence is the sole proximate cause of the entire harm. Thus, because the issue of proximate cause rests with the jury and because the plaintiff bears the burden of demonstrating an enhancement of the original injury under *Lujan*, we conclude that a physician accused of subsequent medical negligence may rebut the plaintiff's evidence of causation through evidence of the initial tortfeasor's responsibility for the entire harm.

{38} The Court of Appeals, based on its interpretation of *Lujan*, also concluded that

the district court erred in instructing the jury on comparative fault. *Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶¶ 55–56. We agree with the Court of Appeals that the district court's comparative fault instruction was erroneous, but for somewhat different reasons. As noted above, Plaintiff introduced evidence that Lewis would have survived if he had received proper medical treatment. Thus, Plaintiff introduced evidence which, if accepted by the jury, would satisfy the first element of *Lujan* requiring proof of an enhanced injury. However, Plaintiff failed to introduce any evidence of the injuries that Lewis would have received absent negligence on the part of Defendants. As a result, Plaintiff failed to satisfy the second element of the *Lujan* standard. Indeed, Plaintiff's failure of proof in this case is analogous to the failure of proof in *Duran* and *Huddell*.

{39} In *Duran*, the injured party was involved in an initial car accident unrelated to the vehicle's design. *Duran*, 101 N.M. at 743–44, 688 P.2d at 780–81. In a claim against the manufacturer of the vehicle, the plaintiff argued that injuries sustained from a defective design of the vehicle constituted a "second collision" and that the vehicle's lack of crashworthiness was the sole proximate cause of the serious injuries suffered in the accident. *Id.* at 750, 688 P.2d at 787. The plaintiff's expert attempted to establish the extent of injury that the plaintiff would have suffered in a car accident in the absence of a defective design. *Id.* at 752, 688 P.2d at 789. However, in formulating his opinion about the degree of enhancement, the expert assumed not only the absence of a defective design but also the absence of particular damage to the vehicle that was caused by the initial car accident. *Id.* The Court of Appeals explained that, in a crashworthiness case,

> [d]efendants are not liable for injuries caused by the initial impact and [damage to the vehicle] resulting therefrom. They are only liable, if at all, for that portion of the damage or injury caused by the defects *over and above* the damage or injury that probably would have occurred as a result of the [accident] without those defects.

> The [expert] does not address this in his testimony....

*Id.*

{40} Like *Duran*, *Huddell* also involved a crashworthiness claim against the manufacturer of a vehicle that was involved in an initial automobile accident. *Huddell*, 537 F.2d at 731. The plaintiff, the victim's personal representative, attempted to establish that a defective design caused the victim's death. Similar to the present case, the plaintiff's experts testified that the car accident in which the injured party was involved would have been "survivable" but for the defective design. *Id.* at 738. However, the experts did not testify concerning "the extent of injuries, if any, which would have resulted in a survivable crash." *Id.*

> Without proof to establish what injuries would have resulted from a non-defective [design], the plaintiff could not and did not establish what injuries resulted from the alleged defect.... Without such proof, the jury could not have properly ... assessed responsibility against [the manufacturer] for the death of [the victim].

*Id.*

{41} As in *Huddell*, although Plaintiff introduced evidence that Lewis would have survived if he had received proper medical treatment, Plaintiff failed to demonstrate the extent of injuries that Lewis would have suffered in the absence of Defendant's alleged medical negligence. The Court of Appeals explained in *Duran* that a failure of proof of this type will result in a directed verdict for a defendant. *Duran*, 101 N.M. at 753, 688 P.2d at 790. Instead of directing a verdict for Defendants under *Lujan*, however, the district court denied Plaintiff's pretrial request to prevent the jury from considering Griego's role in Lewis's death and, at the request of both Plaintiff and Defendants, gave an instruction on comparative fault in accordance with UJI 13–302D. While the district court correctly denied Plaintiff's pretrial request, it was error to instruct the jury on comparative fault for two reasons. First, the comparative fault instruction improperly placed the burden on Defendants to show that Griego was a proximate cause of Lewis's death. *See* UJI 13–

302D. Contrary to our adoption of the *Hud-dell* test in *Lujan*, this instruction inappropriately relieved Plaintiff of the burden of proving an enhancement of the original injury caused by Griego and shifted the burden of proving the degree of enhancement to Defendants. Thus, although the Court of Appeals correctly determined that it was error to give this instruction, this error did not prejudice Plaintiff. Second, assuming Plaintiff had successfully demonstrated an enhanced injury and the degree of enhancement, it would be improper to instruct the jury on comparative fault because Defendants would have been liable for the entirety of the enhanced injury and apportionment of fault with respect to the enhancement would be improper. This error also did not prejudice Plaintiff because she failed to introduce any evidence of the degree of enhancement and because the jury did not reach the issue of apportionment of fault.

{42} It appears that Plaintiff's basic strategy in this case was to attempt to hold Defendants' jointly and severally liable for the entire harm initiated by Griego. Plaintiff sought to exclude all evidence of Griego's fault and made no effort to prove the degree of enhancement of Lewis's injuries caused by the alleged medical negligence. Plaintiff simply sought to hold Defendants liable for the entirety of Lewis's damages for wrongful death. However, a theory of joint and several liability against a successive medical care provider for the entire harm suffered from both torts is antithetical to the policies underlying our opinion in *Lujan* and contrary to New Mexico's adoption of several liability. "Although an original tortfeasor may be held liable for plaintiff's entire harm, a medical care provider who negligently aggravates the plaintiff's initial injuries is not jointly and severally liable for the entire harm, but is liable only for the additional harm caused by the negligent treatment." *Lujan*, 120 N.M. at 427, 902 P.2d at 1030.

{43} The Court of Appeals recognized this aspect of *Lujan*. *See Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶ 46 ("A successive tortfeasor's liability for the enhancement to the original injury is not accurately described as joint and several.

Successive tortfeasors are simply liable for the entire enhancement if proximately caused by their negligence."). However, by prohibiting any evidence of the initial tortfeasor's fault and by concluding that trial courts may, in medical malpractice cases, determine "successive tortfeasor liability before trial," *Lewis*, 128 N.M. 269, 992 P.2d 282, 1999–NMCA–145, ¶ 38, the Court of Appeals' interpretation of *Lujan* is tantamount to instructing trial courts to find for plaintiffs as a matter of law on the issue of proximate causation, as determined by both parts of the *Lujan* test, based solely on an allegation of an enhanced injury. *See id.* ¶ 41, 902 P.2d 1025. While we agree that it is possible to determine as a matter of law that a case involving medical treatment for an injury caused by an initial tort is a case that implicates the proof requirements of *Lujan*, it is for the jury to determine the issue of proximate causation. If a plaintiff is unable to establish a distinct enhancement of injury and the degree of enhancement, then the plaintiff has failed to carry the burden of proving proximate causation in a successive tortfeasor case under the principles we adopted in *Lujan*, and the original tortfeasor remains liable for the entire harm.

{44} In this case, the district court did not err in denying Plaintiff's request to exclude evidence of Griego's fault. Although it was error to instruct the jury on principles of comparative fault, this error had the effect of shifting Plaintiff's burden of proving causation under *Lujan* to Defendants and therefore did not cause her prejudice.

## IV. Conclusion

{45} The district court did not abuse its discretion in excluding witnesses in response to discovery violations by Plaintiff. The district court also did not abuse its discretion in denying Plaintiff's motion to reopen discovery. Under *Lujan*, Plaintiff bore the burden of proving that Defendants, and not the initial stabbing by Griego, proximately caused Lewis's death. As a result, Defendants were entitled to rely on evidence of Griego's fault in their argument that Griego's tortious actions were the sole proximate cause of Lewis's death. Plaintiff bore the burden of dem-

onstrating an enhanced injury over and above the injuries suffered as a result of the initial tort and the degree of enhancement by introducing evidence of what injuries would have occurred in the absence of the alleged medical negligence. The comparative fault jury instruction improperly relieved Plaintiff of this burden. We reverse the Court of Appeals on both issues presented to this Court on certiorari. The judgment in favor of Defendants is reinstated.

{46} IT IS SO ORDERED.

WE CONCUR: JOSEPH F. BACA, Justice, GENE E. FRANCHINI, Justice, PAMELA B. MINZNER, Justice, PETRA JIMENEZ MAES, Justice.