2002-NMCA-084

53 P.3d 398

**Tom COUCH and Emily Couch, Plaintiffs–Appellees/Cross–Appellants,**

v.

**ASTEC INDUSTRIES, INC., Southwest Crane, Inc., and Joseph Williams, Defendants–Appellants/Cross–Appellees.**

**No. 21,214.**

Court of Appeals of New Mexico.

June 19, 2002.

Certiorari denied, No. 27,597, Aug. 1, 2002.

David L. Plotsky, Plotsky & Dougherty, P.C., Albuquerque, NM, for Appellees/Cross–Appellants.

W. Jeffrey Hollingsworth, Alicia Brown Oliver, Chambliss, Bahner & Stophel, P.C., Chattanooga, TN, Charles A. Pharris, Keleher & Mcleod, P.A., Albuquerque, NM, for Appellants/Cross–Appellees.

*OPINION*

FRY, Judge.

{1} Plaintiff Tom Couch was seriously injured in the course of his employment when his foot was caught in a tail pulley on an asphalt recycling plant manufactured by Defendant Astec Industries, Inc. Plaintiff sued Defendant for strict product liability and negligence, and Plaintiff's wife sued for loss of consortium. The jury found Defendant liable, and, taking into account its assessment of comparative fault, awarded Plaintiff $1,050,000 in compensatory damages. Defendant appealed, and Plaintiff and his wife cross-appealed.

{2} In the main appeal, Defendant raises three primary issues. First, Defendant contends the trial court erred in admitting expert testimony on liability and hedonic damages, evidence of government standards, and evidence of post-accident remedial measures undertaken by Plaintiff's employer. Second, Defendant claims there was insufficient evidence from which the jury could reasonably determine that Defendant was responsible for Plaintiff's "enhanced injury" or that Defendant was negligent or strictly liable to Plaintiff. Third, Defendant argues the trial court erroneously instructed the jury that Defendant had a duty to retrofit the recycling plant. In the cross-appeal, Plaintiff and his wife argue that the trial court erred in granting Defendant's motion for directed verdict for, respectively, punitive damages and loss of consortium. We affirm.

**BACKGROUND**

{3} Defendant manufactures asphalt plants and road paving equipment. Plaintiff was injured on August 18, 1997, while working for CalMat (Employer), which produces hot-mix asphalt used to pave highways and streets. At the time of the accident, Plaintiff

was working around the recycle bin and adjacent conveyor belts of an asphalt plant designed and manufactured by Defendant in 1988 and sold to Employer in 1989. The recycle bin holds recycled asphalt pavement (RAP). A feeder belt carries the RAP from the bottom of the bin and drops it onto an incline conveyor belt, which then carries the RAP up to the drum dryer where it is mixed with other ingredients to make new hot-mix asphalt. The incline conveyor belt rotates around the tail pulley, a cylindrical object, located at the bottom of the conveyor.

{4} On the day of the accident, Plaintiff loaded the recycle bin with a front-end loader, noticed that no RAP was on the feeder belt under the bin, and determined that the bin had jammed. In an attempt to unclog the bin and restart the RAP flow, Plaintiff climbed inside the bin and shoveled material out onto the ground. Plaintiff's action did not unclog the jam. Plaintiff then decided to re-enter the bin. The plant operator had shut off the feeder belt, but the incline conveyor belt continued to run. Instead of using a ladder to access the bin, Plaintiff climbed up on its frame and stepped on the guard attached to the conveyor belt frame. The guard was supposed to prevent contact with the conveyor belt and tail pulley.

{5} The parties disputed the guard's role in the accident. Plaintiff argued that the guard was inadequate because it did not extend far enough past the nip point of the tail pulley and because it permitted a nine-inch gap between the belt and the conveyor frame. Plaintiff maintained that his foot was able to slip through the gap and come in contact with the conveyor belt which caused him to fall and ultimately resulted in his leg becoming entangled in the tail pulley. Conversely, Defendant argued that it was not the height of the guard or the gap that caused the accident, but instead either Plaintiff's negligence in failing to follow the proper procedures to unclog the recycle bin or Employer's negligence in failing to adequately bolt the guard to the frame. Defendant contended that the improperly secured guard slipped and caused Plaintiff's foot to come in contact with the conveyor belt.

{6} After falling onto the conveyor belt, Plaintiff became entangled in the tail pulley mechanism, first by his foot, then his leg, and finally his thigh and groin area. A co-worker discovered Plaintiff holding onto the conveyor belt frame to keep from being pulled further into the tail pulley. Plaintiff sustained a fractured tibia and a ripping, degloving injury to his thigh.

{7} Plaintiff also argued that the asphalt plant should have been equipped with an emergency pull cord on the conveyor belt. A pull cord is a device that, if tripped, shuts down the power to the motors driving the conveyor belt within seconds. Plaintiff claimed that if there had been a pull cord on the conveyor belt, his fall would have tripped the cord, the belt would have stopped within seconds, and his injuries would not have been as extensive.

## DISCUSSION

*Defendant's Appeal*

### Admission of Evidence

{8} Defendant argues that the trial court erred in admitting four specific types of evidence. We review the admission of evidence for abuse of discretion. *Coates v. Wal–Mart Stores, Inc.*, 1999–NMSC–013, ¶ 36, 127 N.M. 47, 976 P.2d 999.

### Expert Testimony on Liability

{9} Defendant argues the trial court erred in admitting the testimony of Plaintiff's safety expert, Vincent Gallagher, because he was not qualified to offer opinions on the design and engineering of the asphalt plant and because his testimony was unreliable. Rule 11–702 NMRA 2002 provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

{10} We first address Gallagher's qualifications. Gallagher has a master's degree in occupational safety and health, and he presently works as a safety expert in the field of safety analysis—specifically, hazard identification, evaluation, and control. He has ana-

lyzed industrial injuries, hazards, and workers' exposure to hazards in relation to the causes of accidents, as well as the feasibility and technical means of controlling hazards. Gallagher has taught these subjects and has developed hazard controls in industrial settings, including hazard controls for conveyors. In addition, Gallagher has considerable experience with machine guarding, including research, teaching, and publishing on the subject.

{11} The trial court ruled that Gallagher would be permitted to explain how safety can be designed and built into a product. Specifically, the court allowed Gallagher to state opinions on Defendant's design of the plant and the issue of retrofitting to add pull cords. The court accepted Gallagher "as an expert in the areas of princip[le]s and practices in hazard identification[,] ... guarding conveyor belts, ... and the princip[le]s and practices [of] product safety management."

{12} Consistent with this directive, Gallagher's testimony related to his safety expertise. Gallagher testified, based on a review of safety standards, discovery material, and deposition testimony, that Defendant failed to provide adequate guarding; failed to provide a safe means of access; failed to provide an emergency pull cord; failed to provide adequate safety instructions to Employer or its workers to safely perform unclogging; and failed to utilize a sufficient product safety management program consisting of written hazard analysis or appropriate warnings and instructions. Gallagher explained what goes into an appropriate product safety management program and how pull cords function to minimize hazards. Gallagher opined that Defendant's lack of a written product safety program and its failure to provide adequate guarding, safe access, and pull cords resulted in a defective product.

{13} Given Gallagher's qualifications and testimony, we disagree with Defendant's assertion that Gallagher's testimony was speculative, subjective, and unreliable and that its probative value was outweighed by any prejudicial effect. Gallagher's testimony was relevant and helpful to the fact finder. He is a safety expert, and the issues in this case concern whether the manufacturing plant built and sold by Defendant presented unreasonable safety hazards. Safety issues related to industrial plants are not matters within the average lay person's repertoire. *See Mott v. Sun Country Garden Prods., Inc.*, 120 N.M. 261, 269, 901 P.2d 192, 200 (Ct.App. 1995) (recognizing that expert testimony is admissible in cases where the "average juror would have no basis for evaluating the evidence without the assistance of an expert") (citation and internal quotation marks omitted). As a safety expert, Gallagher's testimony assisted the jury in understanding the hazards presented by a tail pulley and how pull cords and adequate guards may prevent accidents.

{14} Further, although Gallagher is not an engineer and has not personally designed conveyor belts, guards, or emergency pull cords, the trial court could reasonably conclude that his expertise in evaluating product designs and conveyor belts for safety hazards qualified him to offer opinions on these subjects. *See Smith v. Ingersoll–Rand Co.*, 214 F.3d 1235, 1243–44 (10th Cir.2000) (affirming admission of Gallagher's testimony and explaining that his lack of first-hand knowledge of the machine in question went to the weight, not the admissibility, of his testimony); *State v. Dorsey*, 93 N.M. 607, 609, 603 P.2d 717, 719 (1979) (stating that the jury assesses the relative weight of lay or expert testimony).

{15} Based on the foregoing discussion, we hold that the trial court did not abuse its discretion in determining that Gallagher was qualified to testify as a safety expert and in admitting his testimony. *See Shamalon Bird Farm, Ltd. v. U.S. Fid. & Guar. Co.*, 111 N.M. 713, 714, 809 P.2d 627, 628 (1991) (explaining that the trial court has wide discretion to determine whether a witness is qualified to testify as an expert).

## Expert Testimony on Hedonic Damages

{16} Defendant argues the trial court erred in allowing Plaintiff's expert economist, Brian McDonald, to testify regarding hedonic damages. Defendant specifically contends that admission of the testimony was improper because the expert did not offer an opin-

ion on the monetary value of Plaintiff's loss of enjoyment of life.

{17} In New Mexico, "it is not improper for the trial court to permit an economist to testify regarding his or her opinion concerning the economic value of a plaintiff's loss of enjoyment of life." *Sena v. N.M. State Police*, 119 N.M. 471, 478, 892 P.2d 604, 611 (Ct.App.1995). Although our case law does not expressly address the appropriate contours of expert testimony on hedonic damages, in *Smith*, 214 F.3d at 1244, the Tenth Circuit Court of Appeals held that it was proper under New Mexico law for the hedonic expert to explain his interpretation of the meaning of hedonic damages and to describe broad areas of human experience to be considered in determining such damages.

{18} In the present case, McDonald addressed various studies that have attempted to quantify the value of "a statistical life." He testified that these studies posited a range of values from $500,000 to $11 million and that the average value of a whole life as gleaned from these studies was $3 million. He testified that this figure included the value of an entire life from cradle to grave and included earnings as well as intangible enjoyment. When asked to specify the percentage of a whole life that Plaintiff lost as a result of his injuries, McDonald declined and explained that the jury would determine the percentage.

{19} Defendant complains that McDonald's refusal to specify a percentage or value for Plaintiff's loss of enjoyment of life rendered his testimony unhelpful to the jury, resulting in improper juror speculation. We disagree. McDonald's testimony regarding statistical life studies gave the jury a range of monetary values that likely proved helpful in evaluating Plaintiff's claim. He also provided concrete guidance to the jury in determining a percentage of the monetary value that might reasonably compensate Plaintiff. For example, McDonald testified that people often derive enjoyment from their work above and beyond the amount they are compensated and from recreational activities. McDonald could not tell the jury how to evaluate these specifics; the jury would have to rely on other evidence, such as Plaintiff's

testimony, to determine how Plaintiff derived the most enjoyment from his life and how his injuries affected that enjoyment.

{20} This determination is similar to the jury's evaluation of pain and suffering. The law has entrusted the jury with the task of weighing the evidence of a plaintiff's pain pursuant to "the enlightened conscience of impartial jurors acting under the sanctity of [their] oath ... with fairness to all parties," UJI 13–1807 NMRA 2002, and we see no difference in the process of evaluating the loss of enjoyment of life. To the contrary, if McDonald had complied with Defendant's request and offered a specific value for Plaintiff's hedonic damages claim, he would have intruded improperly into the fact finder's domain. *See Smith*, 214 F.3d at 1246 (noting that because the expert witness properly "made no attempt to apply the facts of this case to the criteria he proffered to the jury[,] the jury remained free to exercise its fact-finding function"). We therefore affirm on this issue.

## Evidence of Government Regulations

{21} Defendant argues the trial court improperly admitted evidence of governmental regulations. Specifically, Defendant argues that the applicable governmental regulations, particularly standards of the Occupational Safety and Health Administration (OSHA), are directed toward employers rather than manufacturers. While we agree that this is an accurate statement, we are not persuaded that the admission of OSHA regulations was erroneous.

{22} New Mexico law holds that the standards expressed in OSHA regulations, as developed by appropriate expert or other testimony, may be admitted as objective safety standards and practices generally prevailing in the community on the issue of negligence. *See Fabian v. E.W. Bliss Co.*, 582 F.2d 1257, 1261 (10th Cir.1978) (recognizing that under New Mexico law, industry standards are not conclusive as to ordinary care and design, but are admissible evidence); *Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 381, 902 P.2d 54, 63 (1995) (holding that evidence of compliance with industry stan-

dards is relevant to whether the manufacturer was negligent or whether the product poses an unreasonable risk of injury, but should not conclusively demonstrate whether the manufacturer was negligent or the product defective). Thus, just as Defendant's experts referred to OSHA regulations to argue that the recycling plant complied with government standards, the trial court properly allowed Plaintiff's expert witness to refer to government standards in expressing his opinion on the adequacy of the guarding, lack of pull cords, and product safety program. *Griffin v. Guadalupe Med. Ctr., Inc.*, 1997–NMCA–012, ¶ 14, 123 N.M. 60, 933 P.2d 859 (explaining that the determinations of relevancy and materiality rest largely within the discretion of the trial court).

{23} Defendant broadly asserts "there was no proof that OSHA was used as an industry standard in 1988, the year that [Employer's] conveyor belt was designed and manufactured." Defendant's assertion, however, includes no citation to authority or reference to how this particular argument was preserved below, and it does not specify the regulation or testimony to which it refers. *See Pinnell v. Bd. of County Comm'rs*, 1999–NMCA–074, ¶ 11, 127 N.M. 452, 982 P.2d 503 (declining to consider argument where party failed to cite to any portion of the record supporting its allegation); *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App. 1987) (explaining that "[t]o preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court"). Nevertheless, even if this argument had been properly preserved, we would affirm because Gallagher testified that the OSHA standards for guards on which he relied were in effect at the time of the plant's manufacture.

{24} Finally, Defendant argues that the trial court improperly allowed Gallagher to testify regarding Defendant's non-compliance with standards of the Mine Safety & Health Administration (MSHA). We disagree. The record indicates the trial court ruled that Plaintiff's expert could not refer to MSHA because those regulations relate to mining equipment.

## Subsequent Remedial Measures

■ {25} Defendant argues the trial court erred in admitting evidence regarding post-accident remedial efforts by Employer. Defendant specifically objects to the admission of evidence that on the day following the accident, Employer added additional guards to eliminate the gaps between the guard and the conveyor belt frame and to completely enclose the tail pulley. The trial court permitted introduction of two photographs showing a portion of the new guard, as well as information that Employer was the source of the new guards. This issue relates to Rule 11–407 NMRA 2002:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment.

{26} We are not persuaded by Defendant's argument because the prohibition against admitting evidence of subsequent remedial measures does not apply to measures taken by non-defendants. Employer was not a party in this case and Rule 11–407, therefore, is not applicable. *See Mehojah v. Drummond*, 56 F.3d 1213, 1215 (10th Cir.1995) (holding that Rule 407 applies only to a *defendant's* remedial measures and does not apply to subsequent remedial measures by non-defendants); *Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880, 888 (9th Cir.1991) (explaining that the purpose of Rule 407 is to encourage potential defendants to remedy hazardous conditions without fear that their actions will be used as evidence against them, and therefore, Rule 407 applies only to actions of actual defendants); *TLT–Babcock, Inc. v. Emerson Elec. Co.*, 33 F.3d 397, 400 (4th Cir.1994) (holding that evidence of subsequent remedial measures by non-defendants is admissible because such admission

will not inhibit non-defendants from taking remedial measures).

■ {27} We also reject Defendant's argument that the prejudicial effect of the admitted evidence outweighed its probative value. *See* Rules 11–401 and 11–403 NMRA 2002. The evidence that Employer added the guard without a gap was highly relevant because it gave rise to an inference that the product was defective as manufactured, and that it was a gap between the guard and the belt—not a loose guard—that caused Plaintiff's foot to come into contact with the conveyor. The prejudice to Defendant was not unduly harsh. The trial court instructed the jury on the proper questions to consider, and Defendant failed to request a limiting instruction on the effect of the evidence. *See Norwest Bank N.M. v. Chrysler Corp.*, 1999–NMCA–070, ¶ 40, 127 N.M. 397, 981 P.2d 1215 (recognizing that the jury is presumed to follow the court's instruction). The trial court acted within its sound discretion in admitting this evidence. *Mac Tyres, Inc. v. Vigil*, 92 N.M. 446, 448, 589 P.2d 1037, 1039 (1979) (noting that trial court is vested with great discretion in applying Rule 11–403 and its ruling will not be disturbed absent an abuse of that discretion).

## Substantial Evidence Supported the Jury's Verdict on Enhanced Injury and Product Liability

{28} Defendant argues the trial court erred in failing to rule as a matter of law that Plaintiff failed to prove enhanced injury, negligence, and strict liability. "A directed verdict is appropriate only when there are no true issues of fact to be presented to a jury." *Sunwest Bank v. Garrett*, 113 N.M. 112, 115, 823 P.2d 912, 915 (1992). Here, the evidence on these issues was disputed, and we therefore review to determine whether substantial evidence supported the jury's verdict. We view the evidence in the light most favorable to the prevailing party and make all reasonable inferences to support the judgment. We will affirm the jury's verdict if there is evidence to support it. *See Zemke v. Zemke*, 116 N.M. 114, 118, 860 P.2d 756, 760 (Ct.App. 1993).

## Enhanced Injury

■ {29} Defendant argues the trial court erred in failing to rule as a matter of law that Plaintiff failed to prove an enhanced injury. Plaintiff claimed that he suffered enhanced injuries because the conveyor belt did not have emergency pull cords attached to the frame. Plaintiff argued that if there had been a pull cord on the conveyor belt, he would have tripped it, thereby stopping the conveyor and curtailing the extent of his injuries.

{30} In New Mexico, the enhanced injury doctrine, also called the "crashworthiness" doctrine, has been applied in actions against product manufacturers. *Norwest Bank N.M.*, 1999–NMCA–070, ¶ 10, 127 N.M. 397, 981 P.2d 1215; *Cleveland v. Piper Aircraft Corp.*, 890 F.2d 1540 (10th Cir.1989). The doctrine has also been extended to cases not involving products. *See, e.g., Lujan v. Healthsouth Rehab. Corp.*, 120 N.M. 422, 427, 902 P.2d 1025, 1030 (1995) (recognizing that a medical care provider may negligently aggravate a plaintiff's initial injuries).

{31} As these cases demonstrate, generally the original tortfeasor and the tortfeasor who purportedly enhanced the injuries caused by the original tortfeasor are two different entities. Thus, in order to prove a case against the successive tortfeasor, a plaintiff must attempt to distinguish the enhanced injury from the original injury. *Lewis v. Samson*, 2001–NMSC–035, ¶ 35, 131 N.M. 317, 35 P.3d 972 ("In an enhanced injury case ... the plaintiff must still prove that the physician's negligence proximately caused an enhancement of the initial harm suffered at the hands of the original tortfeasor.").

{32} Here, the enhanced injury claim arose in an unusual procedural context. Plaintiff claimed Defendant was liable for all of his injuries and made no distinction between original or enhanced injuries. In contrast, Defendant argued in a motion in limine that Plaintiff should not be allowed to argue that the absence of a pull cord led to his injuries unless he introduced evidence through a medical expert that its absence enhanced his injuries. The trial court denied

this motion. When the parties submitted their requested jury instructions, neither sought an instruction on the enhanced injury theory.

{33} However, when the trial court was reviewing the instructions to be given, Defendant argued that Plaintiff's claim regarding the absence of pull cords was really an enhanced injury claim. In other words, Defendant maintained that the absence of a pull cord served at worst to increase Plaintiff's exposure to the tail pulley, and had a pull cord been present, it would not have prevented Plaintiff's injury. Therefore, in Defendant's view, Plaintiff had to bear the burden of distinguishing between the injuries he would have sustained if the plant had been equipped with pull cords and the injuries he sustained without the pull cords. Plaintiff objected, arguing that the injuries he sustained were the result of "a continuous series of events precipitated by the defendant's defective product."

{34} The trial court agreed with Defendant and instructed the jury accordingly. Plaintiff does not claim this as error in his cross-appeal, and we therefore do not address it. We assume, but do not decide, that Defendant's status as both the alleged original tortfeasor and the "crashworthiness" tortfeasor does not preclude application of the enhanced injury doctrine. *See Farrell v. John Deere Co.*, 151 Wis.2d 45, 443 N.W.2d 50, 58 (Ct.App.1989) (explaining that enhanced injury doctrine was properly applied even though successive tortfeasor also caused the initial accident); *Kutsugeras v. AVCO Corp.*, 973 F.2d 1341, 1343–44 (7th Cir.1992) (holding that trial court properly sent the jury a two-tier special verdict, separating the worker's cause of action into the entanglement phase and the enhancement phase). We also assume without deciding that the trial court properly imposed on Plaintiff the burden of proving the enhanced injury. *Cf. Lewis v. Samson*, 1999–NMCA–145, ¶ 83, 128 N.M. 269, 992 P.2d 282 (Hartz, J., dissenting) (noting that who bears the burden of proving enhanced injury damages is not clear under New Mexico law), *rev'd on other grounds*, 2001–NMSC–035, 131 N.M. 317, 35 P.3d 972.

{35} To establish the elements of an enhanced injury, Plaintiff was required to prove (1) that the defective design caused injuries over and above those which otherwise would have been sustained, and (2) the degree of enhancement. The degree of enhancement may be established by proof of what injuries, if any, would have resulted had an alternative, safer design been used. *Lewis*, 2001–NMSC–035, ¶ 34, 131 N.M. 317, 35 P.3d 972.

{36} Regarding the first element, there was evidence that, although a pull cord would not have prevented Plaintiff's initial contact with the conveyor belt, once activated, it would have prevented him from further entangling his leg. Several witnesses testified that Plaintiff's entanglement lasted anywhere from thirty seconds to "a couple of minutes." If a pull cord had been in place and if Plaintiff had tripped it, the cord would have automatically shut down the conveyor within seconds. Gallagher explained that if pull cords are designed properly, they act as a pressure-sensitive device that is automatically activated before the conveyor belt moves into the danger area—the tail pulley. Defendant's vice president of engineering demonstrated where the pull cord would have been located on the recycle plant in question had it been equipped with one. Plaintiff and eyewitnesses testified about Plaintiff's location when he initially came in contact with the conveyor belt. Gallagher considered the foregoing testimony and opined that Plaintiff's foot would have tripped a pull cord before it landed on the conveyor. This in turn would have stopped the motor and caused the tail pulley to stop turning within about one second.

{37} Regarding the second element, Plaintiff testified that, after coming in contact with the conveyor belt, his foot first became entangled and eventually the conveyor belt moved his leg further into the tail pulley. Plaintiff's orthopedic surgeon testified that if the machine had been cut off approximately five seconds after Plaintiff's foot was caught, Plaintiff's injuries would have been restricted to the area below the knee.

{38} The foregoing evidence supports an inference that the longer Defendant's leg was

exposed to the tail pulley, the more injuries the leg sustained. Although no testimony specifically pinpointed a place on Plaintiff's leg where the entanglement would have stopped upon activation of an emergency pull cord, such precision is not required by our case law. *See Duran v. Gen. Motors Corp.*, 101 N.M. 742, 750, 688 P.2d 779, 787 (Ct.App. 1983) (" '[T]he plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the defective design' ") (quoting *Huddell v. Levin*, 537 F.2d 726, 738 (3rd Cir.1976)) *overruled on other grounds by Brooks*, 120 N.M. at 383, 902 P.2d at 65. Accordingly, it was the jury's prerogative as fact finder to assess the degree of enhancement and the appropriate damages.

{39} Based on the foregoing discussion, we hold that the jury reasonably could have found that Plaintiff proved his claim for enhanced injury due to the absence of a pull cord. We recognize that Defendant introduced evidence supporting a different outcome; however, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177.

■ {40} Defendant also argues that Plaintiff failed to prove the enhanced injury claim because he did not establish that a pull cord was a safer, feasible, alternative design. *See Huddell*, 537 F.2d at 737, cited with approval in *Duran*, 101 N.M. at 749–50, 688 P.2d at 786–87. However, there is nothing in the record to indicate that Defendant asked the trial court to instruct the jury on this element of proof. As previously noted, Defendant first mentioned the need for an enhanced injury instruction at the conference where jury instructions were settled. Defendant suggested language for such a jury instruction, but it made no mention of an element requiring Plaintiff to prove that the alternative design—a pull cord—was safer and practicable. The court charged Plaintiff's counsel with the responsibility of drafting the enhanced injury instruction, and Defendant did not object to Plaintiff's tendered

instruction before the court instructed the jury. The court gave the tendered instruction, which did not state that Plaintiff was required to prove that a pull cord was a safer and practicable design. Jury instructions not objected to become the law of the case. *Gutierrez v. Albertsons, Inc.*, 113 N.M. 256, 259 n. 1, 824 P.2d 1058, 1061 n. 1 (Ct.App. 1991). Consequently, we hold that Defendant failed to preserve the argument it now makes on appeal.

### Strict Liability and Negligence

■ {41} With respect to Plaintiff's claims for strict liability and negligence, Defendant contends that either Plaintiff's own negligence or Employer's failure to secure the tail pulley guard to the conveyor frame caused the accident. As noted previously, the evidence was disputed as to whether Plaintiff's foot came in contact with the conveyor belt because of Employer's failure to adequately secure the guard, because of an impermissible gap between the guard and the conveyor belt, or because of Plaintiff's own negligence.

{42} In order to hold Defendant strictly liable, the jury had to find that a condition of the recycling plant or the manner of its use caused an unreasonable risk of injury to "persons whom the supplier can reasonably expect to use the product." UJI 13–1406 NMRA 2002. In order to conclude that Defendant was negligent, the jury had to find that Defendant failed to use ordinary care in designing or making the recycling plant. UJI 13–1410 NMRA 2002. Plaintiff presented evidence through Gallagher supporting the theory that the plant was unreasonably dangerous because the gap between the guard and the belt was large enough for a person's foot to slip through and the conveyor belt was not equipped with pull cords. As discussed below in connection with Defendant's post-sale duty, Plaintiff also presented evidence from which the jury could reasonably infer that Defendant knew or should have known about these purported defects.

{43} Although Defendant presented evidence supporting its countervailing theories, it was the jury's prerogative as the fact finder to disbelieve Defendant's view of what

caused the accident and rely instead on testimony, as presented primarily by Gallagher, that Defendant's conduct caused Plaintiff's injuries. *See Buckingham v. Ryan*, 1998–NMCA–012, ¶ 10, 124 N.M. 498, 953 P.2d 33. While the jury found Plaintiff and Employer comparatively negligent, this does not free Defendant from liability. *See, e.g., Smith v. Bryco Arms*, 2001–NMCA–090, ¶ 42, 131 N.M. 87, 33 P.3d 638 (recognizing that a product's misuse by the consumer does not necessarily operate to bar recovery as a matter of law). Because evidence was presented to support Plaintiff's position, we affirm.

**The Trial Court Properly Instructed the Jury on Defendant's Post–Sale Duty**

{44} Defendant argues that the trial court erred in recognizing a duty to retrofit when it instructed the jury in accordance with UJI 13–1402 NMRA 2002:

> The supplier's duty to use ordinary care continues after the product has left [his][her][its] possession. A supplier who later learns, or in the exercise of ordinary care should know, of a risk of injury caused by a condition of the product or manner in which it could be used must then use ordinary care to avoid the risk.

While Defendant limits its argument to the duty to retrofit, Plaintiff's theory of Defendant's post-sale obligations was more expansive. Plaintiff claimed that Defendant negligently failed to either (1) retrofit the conveyor belt with emergency pull cords after 1994 when Engineering Change Order 195 (ECO 195) went into effect, or (2) notify customers about ECO 195. We also emphasize that UJI 13–1402 does not describe a specific post-sale duty, such as a duty to retrofit. Rather, the instruction tells a jury only that a supplier who, after the sale of the product, knows or should know of any risks associated with the product, "must then use ordinary care to avoid the risk." UJI 13–1402. Thus, it is for the jury to determine what steps—whether by warning or retrofitting or some other means—a supplier must take in the exercise of ordinary care.

{45} Defendant argues that the imposition of a post-sale duty is against public policy.

We acknowledge that courts in other jurisdictions differ on the question of whether to recognize such a duty. *See* Lisa Anne Meyer, Annotation, *Products Liability: Manufacturer's Postsale Obligation to Modify, Repair, or Recall Product*, 47 A.L.R.5th 395 (1997). However, our Supreme Court's adoption of UJI 13–1402 suggests that New Mexico law follows the path of those courts recognizing that a product supplier has a continuing duty of ordinary care to avoid a risk of injury if it knows or should know that such risk is caused by the supplier's product. Because the Supreme Court has not addressed this uniform jury instruction in any reported case, we have the authority to consider whether the instruction is a correct statement of the law. *State v. Wilson*, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994). We are not persuaded that UJI 13–1402 is erroneous.

{46} Defendant has not directed us to any New Mexico law questioning the duty set forth in UJI 13–1402, and we have found none. Consequently, we consider this duty in the same light we would consider any other duty in negligence law. "The ultimate question is whether the law should give recognition and effect to an obligation from one person to another." *Gabaldon v. Erisa Mortgage Co.*, 1997–NMCA–120, ¶ 21, 124 N.M. 296, 949 P.2d 1193, *rev'd on other grounds*, 1999–NMSC–039, 128 N.M. 84, 990 P.2d 197. This legal question is a policy determination guided by "consider[ation] [of] the relationship of the parties, Plaintiff's injured interests, Defendant's conduct in light of those interests, and other principles comprising the law." *Madrid v. Lincoln County Med. Ctr.*, 121 N.M. 133, 141, 909 P.2d 14, 22 (Ct.App.1995).

{47} The courts refusing to recognize post-sale duties generally do so because they believe such duties would inhibit manufacturers from developing innovative safety technology and improving their designs for fear of the expensive and onerous process required to find and warn all past purchasers of a product, or, even more costly, to retrofit the product. *See, e.g.,* Douglas R. Richmond, "Expanding Products Liability: Manufacturers' Post–Sale Duties to Warn, Retrofit and

Recall," 36 Idaho L.Rev. 7, 22–23, 60 (1999); *Gregory v. Cincinnati Inc.*, 450 Mich. 1, 538 N.W.2d 325, 337 (1995) ("imposing a duty to update technology would ... discourage manufacturers from developing new designs if this could form the bases for suits or result in costly repair or recall campaigns"); *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis.2d 882, 275 N.W.2d 915, 923–24 (1979) ("It would place an unreasonable duty upon these manufacturers if they were required to trace the ownership of each unit sold and warn annually of new safety improvements over a 35 year period."). However, critical to the decisions in these cases was the fact that the plaintiffs in most instances claimed that manufacturers must warn customers or retrofit products as technology advances or as industrial practices develop, even if the technology or practice did not exist at the time of manufacture. *See, e.g., Modelski v. Navistar Int'l Transp. Corp.*, 302 Ill.App.3d 879, 236 Ill.Dec. 394, 707 N.E.2d 239, 247 (1999) (refusing to recognize post-sale duties that "would be the equivalent of mandating that manufacturers insure that their products will always comply with current safety standards"); *Gregory*, 538 N.W.2d at 336 (rejecting a manufacturer's "duty to modify its product in accordance with the current state of the art safety features"); *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 944 P.2d 1279, 1301 (1997) (refusing to impose on a manufacturer a "continuing duty to retrofit its products, subsequent to their manufacture and sale, with post-manufacture safety devices that were unavailable at the time of manufacture").

{48} In the present case, the policy reasons relied on by these courts are inapplicable. Here, there is no question that the technology of pull cords existed and was in use at the time Defendant manufactured the plant in question. In fact, standards issued by the American National Standards Institute (ANSI) in 1988 and 1989 required that conveyors in remote locations be "furnished with emergency stop buttons, pull cords, limit switches or similar emergency stop devices." A remote location was defined as "any location with respect to the conveyor from which the presence or position of personnel relative to the conveyor cannot be readily determined from the operator[']s station." Although Defendant argued that the conveyor on this plant was not in a remote location and that it chose not to equip the plant with pull cords at the time of manufacture because of a potentially greater risk of fire in the event of accidental tripping of the cords, the fact remains that pull cord technology was well established when Defendant sold this plant to Employer.

{49} Defendant argued at trial that the technology of the plant's mixing mechanism changed after the sale of this plant and thus, it would be unreasonable to require Defendant to retroactively bring all its previously manufactured plants up to the later-developed state of the art. Defendant's vice president of engineering testified that Employer's plant was a "parallel flow center recycle entry type plant" that could overheat and possibly cause a fire if the accidental tripping of a pull cord cut off power. Plants developed some years later were not subject to the same risk of overheating. It can be inferred from the verdict that the jury did not credit this testimony. Even assuming its accuracy, however, we are not persuaded that this development in technology militates against recognizing a post-sale duty. The critical technology here related to pull cords. ANSI standards required the installation of pull cords on certain conveyor-equipped machinery at the time this plant was manufactured, which establishes that pull cords were state of the art at the time.

{50} Moreover, the evidence established that the parties' relationship extended past the point when Employer purchased the recycle plant from Defendant. Defendant sets up and tests each plant that it manufactures. In addition, Defendant was available by telephone or personal visit to assist Employer to relieve clogging in the recycle bin. Employer could contact Defendant's service personnel twenty-four hours a day by phone to ask questions and set up service calls, and Defendant provided its customers with the opportunity to attend an annual school to discuss, among other things, safety issues. The record further indicates that Defendant's principals try to have contact with at least five customers a day, sometimes traveling to

plant sites to view the equipment, address potential problems, or help customers with concerns. Defendant's service technicians are out on sites "most of the time," available by phone day and night, and actively involved in the maintenance of plants. For example, when Defendant learned about problems with a faulty gas valve on its plants, it sent out three groups of service personnel to change the valves.

{51} In addition, Defendant's president testified that Defendant has a policy of investigating accidents involving its equipment and remedying any safety issues discovered in the process. "[O]ur number one concern is to make sure if we've made a mistake, that we correct it and it's not going to happen again.... [I]f we saw something that would be unsafe that we could guard by a design or guard by a guard or something, that would be done." Because of these post-sale activities and policies, we believe Defendant could be found to have voluntarily undertaken the responsibility described in UJI 13–1402. *See Restatement (Second) of Torts* § 323 (explaining that one who undertakes to perform services may be subject to liability for the negligent performance of those services).

{52} Given Defendant's voluntary undertaking of responsibility post-sale and the existence of pull cord technology at the time of manufacture, we conclude that UJI 13 1402 *in the context of this case* is a correct statement of the law. We do not address or decide whether a manufacturer has a post-sale duty to take steps to address risks that become evident only as a result of technological developments occurring after a product leaves the manufacturer's control. The existence of a duty under those circumstances is not before us and is therefore left to another day.

{53} Defendant next argues that the evidence did not support the use of UJI 13–1402 because (1) Defendant established that there was no risk of injury associated with the plant because it complied with the ANSI standard regarding the use of pull cords, and (2) there was no evidence that Defendant learned after the sale of this plant that there was a defect in the plant. We disagree.

{54} First, although Defendant introduced evidence tending to show that workers around Employer's conveyor were not in a remote location from the control house, and thus, that the ANSI standard requiring pull cords did not apply, Plaintiff introduced countervailing evidence that the men in the control house could not see Plaintiff when he was caught in the tail pulley. Consequently, it was the jury's role as fact finder to determine this factual question. *See Las Cruces Prof'l Fire Fighters,* 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177.

{55} Second, the evidence gave rise to a reasonable inference that Defendant knew or should have known at some point after the sale to Employer that the absence of pull cords created a risk of injury. Plaintiff introduced evidence that Defendant issued ECO 195, which required all conveyors manufactured after 1995 to be equipped with a kill switch pull cable. At the time of manufacture, Employer knew that ANSI required pull cords on conveyors in remote locations, and there was evidence that the conveyor on Employer's plant was in a remote location. Plaintiff introduced evidence regarding the close ties Defendant maintained with its customers and Defendant's policy of investigating accidents and remedying safety problems. From all of this evidence, the jury could have reasonably inferred that Defendant knew or should have discovered some time before Plaintiff's accident that the absence of pull cords on conveyors created a risk of injury requiring remedial measures.

*Plaintiff's Cross–Appeal*

{56} Plaintiff argues the trial court improperly granted Defendant's motions for directed verdict on the issue of punitive damages and the loss of consortium claim asserted by Plaintiff's wife, Emily Couch (Wife). The trial court granted Defendant's motion for directed verdict on Wife's loss of consortium claim at the close of Plaintiff's case. The trial court bifurcated the punitive damages claim and tried the claim separately to the jury following the main trial. At the close of the evidence in the punitive damages proceeding, the trial court directed a verdict in favor of Defendant.

{57} A directed verdict is appropriate when there are no true issues of fact to present to a jury. *See Sunwest Bank,* 113 N.M. at 115, 823 P.2d at 915. In reviewing the evidence on appeal from a judgment entered pursuant to a directed verdict, we consider all evidence and view any conflicts in the evidence in favor of the party resisting the directed verdict. Directed verdicts are not favored and should only be granted when a jury could not logically and reasonably reach any other conclusion. *See W. States Mech. Contractors, Inc. v. Sandia Corp.,* 110 N.M. 676, 679, 798 P.2d 1062, 1065 (Ct.App. 1990). However, "[i]t is fundamental that the evidence adduced must support all issues of fact essential to the maintenance of a legally recognized and enforceable claim." *C.E. Alexander & Sons, Inc. v. DEC Int'l, Inc.,* 112 N.M. 89, 93, 811 P.2d 899, 903 (1991) (citation and internal quotation marks omitted). Thus, if the evidence fails to support an issue essential to the legal sufficiency of the asserted claim, there is no right to a jury trial. *Id.* Whether there exists sufficient evidence to support a claim or defense is a question of law for the trial court that the appellate court reviews de novo. *See Sunwest Bank,* 113 N.M. at 115, 823 P.2d at 915.

### Punitive Damages

{58} In asserting his claim for punitive damages, Plaintiff argued that Defendant's conduct was reckless. *See* UJI 13–1827 NMRA 2002 (stating that conduct that is "[malicious], [willful], [reckless], [wanton], [fraudulent] [or] [in bad faith]" provides the requisite mental state for an award of punitive damages). Recklessness in the context of punitive damages is "the intentional doing of an act with utter indifference to the consequences." *Torres v. El Paso Elec. Co.,* 1999–NMSC–029, ¶ 28, 127 N.M. 729, 987 P.2d 386 (citation and internal quotation marks omitted). Because the purpose of punitive damages is to punish a wrongdoer, a wrongdoer must have a culpable mental state to be liable for punitive damages. *See Albuquerque Concrete Coring Co. v. Pan Am World Servs., Inc.,* 118 N.M. 140, 143, 879 P.2d 772, 775 (1994).

{59} Plaintiff primarily relied on Gallagher's testimony to support his claim for punitive damages. Gallagher testified that Defendant (1) failed to follow a formal, written product safety program with information and instructions regarding how to systematically identify, evaluate, and control hazards; (2) failed to keep product safety management records or implement written design guidelines for its engineers; and (3) failed to implement a written recall or retrofit program to enhance product safety. Gallagher testified that other deficiencies included a nine-inch gap in the guard and the guard's inadequate height, an inadequate way for workers to enter confined spaces, and lack of emergency pull cords.

{60} Plaintiff argues that Gallagher's opinions regarding the foregoing deficiencies established Defendant's conscious disregard for workers' safety. We agree with the trial court that unsafe features in Defendant's plant do not give rise to an inference that Defendant recklessly or consciously disregarded the workers' safety. Plaintiff introduced no documentation or evidence, for example, to show that the safety problems arose from or reflected a reckless indifference, a culpable mind, actual malice, a conscious disregard for workers' safety, or that Defendant simply disregarded applicable safety features. *Cf. Gonzales v. Surgidev Corp.,* 120 N.M. 133, 147, 899 P.2d 576, 590 (1995) (holding that substantial evidence supported claim for punitive damages where defendant, knowing of risks of blindness attending a specific use of its product and knowing that its doctors under-reported the number of complications on follow-up reports, failed to warn patients of well-documented risks of eye-implantation procedure); *Clay v. Ferrellgas, Inc.,* 118 N.M. 266, 269–70, 881 P.2d 11, 14–15 (1994) (affirming award of punitive damages where defendant's negligent installation of a propane conversion system in the car, together with its consistent violation of safety regulations, amounted to corporate indifference and reckless conduct).

{61} To the contrary, Defendant introduced evidence that (1) it did have an integrated safety program that included

engineers and other professionals; (2) Defendant's engineers met twice a year to discuss safety concerns, and lead engineers met four times a year; (3) Defendant made regular service calls to its customers and was always available to address problems; (4) Defendant tried to fix and address problems as they arose; (5) Defendant provides annual seminars for its customers with product designers and field technicians; and (6) Defendant tests its plants before they are shipped. In addition, with respect to the safety concerns specific to Employer's recycling plant, Defendant offered plausible explanations for the absence of pull cords and other design particulars. Consequently, there was no evidence suggesting that Defendant was cavalier about the plant's safety. Although the jury was not persuaded by Defendant's explanations and determined that Defendant should have done things differently, there was no evidence presented to show that Defendant's failure to do so was the result of the culpable mental state necessary to support an award of punitive damages. We therefore affirm on this issue.

### Loss of Consortium

{62} Plaintiff argues that the trial court improperly granted Defendant's motion for directed verdict on Wife's claim for loss of consortium. New Mexico case law recognizes a claim for loss of consortium, which is the emotional distress suffered by one spouse who loses the normal company of his or her mate when the mate is physically injured due to the tortious conduct of another. *Romero v. Byers*, 117 N.M. 422, 425, 872 P.2d 840, 843 (1994).

{63} Wife introduced sparse and very general evidence on her claim for loss of consortium. When asked how the accident changed her life, Wife responded "in every way imaginable ... the financial burden to the emotional stress, to our children, everything just is upside down. We haven't had a moment's peace since this occurred." Dr. Arnet testified that Plaintiff's accident caused Wife and the children worry about Plaintiff and that Wife potentially has some secondary traumatization. However, other than a passing reference to Wife, Dr. Arnet's testimony related primarily to Plaintiff's post-traumatic stress syndrome.

{64} We hold that the foregoing evidence was insufficient as a matter of law to permit the jury to consider a loss of consortium claim. The evidence provided the jury with no means for evaluating the claim. For example, Wife introduced no evidence comparing her marital relationship with Plaintiff before and after the accident. *See, e.g., Newman v. Exxon Corp.*, 722 F.Supp. 1146, 1148 (D.Del.1989) (explaining that the party asserting the claim must have been deprived of some benefit which formerly existed in the marriage). While loss of consortium may sometimes be inferred, Plaintiff did not present sufficient evidence upon which such inference could be made. *See Klein v. Sears Roebuck & Co.*, 773 F.2d 1421, 1428–29 (4th Cir.1985) (holding that the wife's testimony that husband could no longer perform household chores was insufficient evidence upon which to infer a loss of consortium); *Turner v. Smith*, 556 So.2d 983, 991 (La.Ct.App.1990) (affirming trial court's denial of claim where the only evidence was that husband was "ornery, aggravated, wouldn't laugh and couldn't make love because of pain" and that wife "now has to cut the firewood"). Because the evidence was vague and did not show how Plaintiff's injuries adversely affected the marital relationship, we affirm.

### CONCLUSION

{65} We affirm the issues raised both in Defendant's main appeal and in Plaintiff's cross-appeal.

{66} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and MICHAEL D. BUSTAMANTE, Judges.